UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ANDRAE MARC JOHNSON

        Plaintiff,

                                          Civil Action No.:

-vs-

THE CITY OF ORLANDO

HARRISON JOHN KARDON RAINS (34553)

U.S. EQUITY ADVANTAGE, INC.

OLEA LAVERNE MITCHELL

        Defendants

—————————————————————/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Andrae Marc Johnson sue The City of Orlando or ("City");

Harrison Rains or ("Defendant"); U.S. Equity Advantage or ("U.S. Equity"); Olea

Laverne Mitchell or ("Defendant"), and states the following in support of this

Complaint:

## NATURE OF THE ACTION.

1.      This is a 42 U.S. Code § 1983 federal civil rights case against

Defendants City and Rains for the violations of Plaintiff's substantive due

process rights under the Due Process Clause of the Fourteenth

Amendment and the Takings Clause under the Fifth Amendment of the

United States Constitution as applied to the States under the United States

Constitution's Fourteenth Amendment.

2.      This action also includes both *Monell* and vicarious liability claims

against Defendant City and state tort claims against state actor Defendant

Rains and Defendants Mitchell and U.S. Equity Advantage.

3.      Defendants Rains is an Orlando Police Department police officer

employed by Defendant City of Orlando and is a state actor. Defendant

committed these unlawful violations of Plaintiff's constitutional and state

rights under color of law.

## I.      JURISDICTION AND VENUE

4.      Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for violations

of civil right under the Fifth and Fourteenth Amendments to the United

States Constitution.

5.     This Court has subject-matter jurisdiction over this matter pursuant 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights); 28 U.S.C. § 1367 provides supplemental jurisdiction over the state law tort claims that arose from the same common nuclei of facts.

6.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. 1391(b) and M.D. Fla. Loc. R. 1.02(c). Defendant's independent and collective violations of Plaintiff's constitutional rights under the color of law accrued within this district and division.

7.     At all material times, Defendant Harrison John Kardon Rains committed these unlawful violations under the color of state law.

## II.    PARTIES

8.     Plaintiff is an adult male Florida resident residing within this Court's jurisdiction and otherwise sui juris. Plaintiff is the sole owner of the property(s) in question, to wit: A white 2019 Ford Fusion (VIN# 3FA6P0HD5KR183577) and the AUTOPAYPLUS account bearing account ID: 467494 and Chase Auto Finance loan account #: 12024916383835.

9.     Defendant Olea L. Mitchell is an adult female Florida resident residing within this Court's jurisdiction and former girlfriend of the Plaintiff.

10.     Defendant U.S. EQUITY ADVANTAGE, INC. is a Florida for profit corporation and the owner and administrator of the loan acceleration program AUTOPAYPLUS.

11.     Defendant Officer Harrison Rains (34553) is now and at all material times a state actor, being a law enforcement officer of the Orlando Police Department and employed by Defendant City of Orlando.

12.     The City of Orlando is now and at all material times the Municipality governing the Orlando Police Department.

### III.    FACTUAL ALLEGATIONS.

13.     Factual allegations are individualized per Defendant to provide a factual basis for each Defendant's conduct and to impute individual liability. This will effectively notify each Defendant of his/her misconduct and negate the possibility of a shotgun pleading. Factual allegations will undoubtedly be lengthy as these events occurred over a six-month period.

### III(a).        Olea Laverne Mitchell

### BEFORE THE FILING OF THE STOLEN VEHICLE REPORT.

14.     Plaintiff dated Defendant Mitchell briefly in 2020, from June to December to be more specific.

15.     During this period, Plaintiff noticed that Mitchell would not go home and had myriad excuses as to why she wouldn't.

16.     Sometime in August, Plaintiff returned home to find Defendant Mitchell pacing frantically in the parking lot of his home claiming someone had stolen her vehicle.

17.     Defendant's actions, however, were inconsistent with those of a stolen car victim. Mitchell had not even contacted law enforcement.

18.     It was later ascertained that Mitchell's vehicle had been repossessed.

19.     Mitchell had not paid the car note in months. Mitchell explained that she didn't pay the car note because she had signed up for covid assistance and thought that the covid assistance was paying the car note on her behalf.

20.     Defendant, however, couldn't explain all the unread emails, missed phone calls and repossession letters sent to her by the lien holder.

21.     Defendant was now stranded at Plaintiff's residence with no means of transportation.

22.     Plaintiff took Defendant to and from work for a couple of weeks as she couldn't find the cash needed to retrieve the vehicle.

23.     Growing tired of taking Defendant to and from work, Plaintiff
agreed to assist Defendant Mitchell in obtaining some form of
transportation.

24.     On September 9th, 2020, Plaintiff accompanied Defendant Mitchell to
HGreg's, a prominent car dealership in the Orlando area.

25.     Plaintiff chose this dealership because he had previously purchased
a vehicle from said dealership.

26.     Defendant Mitchell wanted a Mercedes Benz.

27.     Plaintiff advised Mitchell to fill out and submit the necessary
documents for purchasing the vehicle to the finance department.

28.     If financing was denied, then and only then will Plaintiff render any
assistance.

29.     While Mitchell was filling out the documents, Plaintiff noticed her
wages. Mitchell made $15.00 per hour and only worked 40 hours per week.

30.     Mitchell's wages were not those permitting the ownership of a
Mercedes Benz.

31.     An argument ensued between Plaintiff and Defendant Mitchell, as
Mitchell was clearly attempting to live above her means. Mitchell
eventually lowered her lofty standards and settled on the car at issue here.
A white 2019 Ford Fusion.

32.    Defendant completed and submitted the requisite documents to the finance department.

33.    There were no offers to finance Defendant Mitchell. No bank nor finance company would assume the risk of financing Mitchell's loan. Mitchell has multiple repossessions and terrible credit.

34.    Mitchell had already told the car dealer that her boyfriend (Plaintiff) would co-sign the purchase of the vehicle.

35.    The Plaintiff was then ushered into the finance office and apprised of Mitchell's dilemma.

36.    HGreg's unequivocally explained that they would not sell any cars to Mitchell, neither as a sole buyer, nor with a co-signor. The vehicle would have to be purchased solely by Plaintiff.

37.    Plaintiff subsequently agreed to purchase the vehicle on HGreg's terms and filled out the requisite documents. Said documents were submitted and financing was secured through Chase Auto Finance. See **EXHIBIT (A)** attached. **(Retail installment sale contract.)**

38.    Defendant Mitchell paid the down payment. Plaintiff was the principal on the insurance with Mitchell listed as a driver.

39.    Registration and ownership were solely Plaintiff's. See **EXHIBIT (B)** attached. **(Vehicle registration).**

40.      HGreg's partners with Defendant U.S. EQUITY ADVANTAGE.

41.      U.S. EQUITY ADVANTAGE offers a loan acceleration product called AUTOPAYPLUS.

42.      Plaintiff had an existing AUTOPAYPLUS account since January of 2019 and opted to use the service again. The vehicle at bar was then added to Plaintiff's existing account.

43.      On the AUTOPAYPLUS enrollment form Plaintiff added Defendant's Mitchell's banking information as she would be paying for the vehicle if she possessed and operated it. Mitchell is not and was not a co-account holder, nor secondary account holder. The only personal information on said account was Defendant's banking information. Plaintiff was the sole owner of the account as the account had been established back in January of 2019, long before Plaintiff had met Defendant Mitchell.

44.      This was done to prevent Mitchell from gaining access to the account, removing her payment information, and running off with the vehicle without paying for it as She had done with previously financed vehicles and has eventually done in the instant case.

45.     In December of 2020, Plaintiff became aware that Defendant Mitchell hails from a family of scammers and was a known con-woman in the Clermont and Orlando area. Plaintiff immediately ended the courtship.

46.     Upon ending the courtship, Plaintiff advised Mitchell that she had six (6) months to get her credit up to snuff and figure out a method in which Plaintiff could sign the vehicle over to her. If this wasn't done in six months, she could no longer drive the vehicle.

47.     In June of 2021, six months later, Defendant Mitchell had not even attempted to rectify the situation.

48.     On June 16th, 2021, Plaintiff contacted Mitchell explaining to her that His debt-to-income ratio was too high due to this vehicle loan being on his credit report and said vehicle loan hindered Plaintiff from securing a mortgage.

49.     Defendant indicated that she was in class and couldn't discuss the matter at that point but would do so after class.

50.     10 days elapsed without a word from Defendant Mitchell. Plaintiff contacted Mitchell on June 26th and requested the vehicle or Plaintiff would seek the assistance of law enforcement.

51.     Defendant Mitchell said she would not relinquish the vehicle sans a court order. Plaintiff would have to take her to court to get his property

back. See **EXHIBIT (C)**   attached. **(Copy of text messages between Plaintiff and Defendant Mitchell.)**

52.        On June 28th, 2021, Plaintiff contacted the Orlando Police Department by phone and requested assistance to rectify the situation. OPD advised that "This is a civil issue", and Plaintiff would have to send Defendant Mitchell a ten (10) days demand letter via certified mail demanding the return of the vehicle at bar. If Mitchell didn't return the vehicle within ten (10) days, Plaintiff could report the vehicle stolen. See **EXHIBIT (Audio.1) (Recorded conversation between OPD and Plaintiff secured through FOIA)**

53.        Plaintiff sent Defendant Mitchell certified demand letter on June 29th, 2021. See **EXHIBIT (D)** attached. **(Copy of notarized demand letter sent to Defendant Mitchell via certified mail**.) Demand letter was returned to Plaintiff unclaimed. See **EXHIBIT (E)** attached. **(Copy of USPS tracking of certified demand letter returned)**.

54.        On July 5th, 2021, Plaintiff sent a copy of said demand letter to Defendant Mitchell via email. No response. See **EXHIBIT (F)** attached. **(Copy of email containing demand letter sent to Defendant Mitchell at** oleamitchell@yahoo.com**)**

55.     On or around July 13th, 2021, Plaintiff received a cancellation letter form Progressive insurance that the insurance policy will be cancelled as of 12.01 a.m. on July 28th, 2021, due to non-payment. See **EXHIBIT (G)** attached. **(Insurance cancellation notice)** Mitchell had not paid the insurance but was still operating the vehicle.

56.     On or around July 14th, 2021, Plaintiff received a hold letter from AUTOPAYPLUS. The letter informed Plaintiff that his account has been placed on hold. See **EXHIBIT (H)** attached. **(Copy of hold letter sent by AUTOPAYPLUS)** Mitchell had fraudulently accessed Plaintiff's AUTOPAYPLUS account on July 1st, 2021, using Plaintiff's address and removed her payment information. The car note was not paid.

57.     During this time Defendant Mitchell maliciously amassed a whopping $160.14 in tolls. See **EXHIBIT (I)** attached. **(Toll invoice: (UTN # R7623787 and UTN # R8112032) Beginning on June 15th, 2021, ending on August 13th, 2021. Emails between Central Florida Expressway Authority and Plaintiff disputing tolls incurred by Defendant Mitchell.)** It can be easily discerned from the invoice that Mitchell is maliciously amassing these tolls. See **EXHIBIT (J) (Toll invoices for March, April, and May respectively, the three months preceding the Plaintiff's demanding the return of the vehicle from Defendant.)** This shows a 218% increase in

tolls for July alone when compared to the total of the three prior months' tolls combined. When compared to June alone, the previous month, the increase in tolls is a whopping 1104%.

58.     More than ten (10) elapsed since the mailing and emailing of the certified demand letter and Defendant Mitchell had made no attempt to relinquish Plaintiff's vehicle.

59.     Any further demands for the return of the vehicle would be futile and law enforcement's involvement was needed. On July 15th, Plaintiff filed a stolen vehicle report.

## III (b) OFFICER HARRISON RAINS (34553)

### THE POLICE REPORT: CASE #: 2021-00234489

60.     On July 15th, 2021, Plaintiff went to the Southwest Community Police Office at 6440 Raleigh St., Orlando, Fl. 32835 armed with all the pertinent vehicle ownership documents and the hold letter and cancellation letter from AUTOPAYPLUS and Progressive insurance respectively. Plaintiff's intention was to file a stolen vehicle report.

61.     Plaintiff has a personal Gmail email account. The email address is progressive859@gmail.com.  Plaintiff has an android phone through which His personal email can be accessed. Through this access, Google maps and

timestamps Plaintiff's location. Google geo-location data shows Plaintiff

arriving at "2021-07-16T00:15:17z.   This time format is the UTC time zone

format used by Google.

62.      Orlando, Florida is in the Eastern Daylight Time zone with a

corresponding UTC time zone of UTC-4. See **EXHIBIT (K)** attached

**(National Institute of Standard and Technology (NIST) Official U.S.**

**time zones with respective UTC time zone equivalents.)**

63.      The Eastern Daylight Time equivalent to the UTC time in the Google

geo-location data is July 15, 2021, at 8:15:17sec p.m. (UTC-4)

64.      Upon arrival at the Southwest Community Police Office, the Plaintiff

attempted to enter the building but was unsuccessful. The Office was

closed.

65.      Plaintiff called the phone number displayed on the door and

explained that He wished to file a police report. Plaintiff was told to wait

in his vehicle until an officer was present to assist Him.

66.      At approximately 8:51 p.m., Defendant Harrison Rains (34553)

approached Plaintiff's vehicle flashing his flashlight. See **EXHIBIT (Vid.1)**

**(Video footage from Rains' body cam secured through the F.O.I.A).**

Plaintiff exited his vehicle and can be seen holding a green and yellow

folder and heard explaining the situation to Defendant Rains.

67.     Plaintiff accompanied Defendant Rains into the Police station to file the stolen vehicle report. At 8:54 pm Defendant Rains turned off his bodycam.

68.     Before Plaintiff could write and file the report, Defendant Rains had to verify rightful ownership of the vehicle and registration through the D.A.V.I.D. system. (Driver And Vehicle Information Database.)

69.     Once rightful ownership of the vehicle was ascertained, Plaintiff was allowed to file the stolen vehicle report. Defendant Rains then verified Defendant Mitchell's identity by showing Plaintiff Her driver's license photo on the D.A.V.I.D. system. Plaintiff positively identified Mitchell.

70.     Plaintiff completed and signed the stolen vehicle report and the stolen vehicle affidavit. See **EXHIBIT (L)** attached. (**Signed stolen vehicle report and stolen vehicle affidavit**)

71.     Defendant Rains then explained to Plaintiff that he would have his night sergeant contact Clermont P.D. and have them send an officer by Defendant Mitchell's home to see if the car was present. (Defendant Mitchell's driver's license boasts a Clermont address.) If the vehicle wasn't present, He would enter the vehicle as stolen.

72.     The vehicle was not there.

73.     Defendant Rains then advised Plaintiff that he would enter the vehicle as stolen, that if said vehicle was found, it would be Plaintiff's sole responsibility to retrieve it or pay for any towing charges lodged.

74.     At 9:41 p.m. Plaintiff left the station. See **EXHIBIT (M)** attached. **(Google semantic location data)** The stolen vehicle report had been filed and everything was now in the hands of the Orlando Police Department. Plaintiff's presence at the station was no longer practical.

75.     Based on Defendant Rains' assurance that the vehicle would be entered into the system as stolen, Plaintiff began contacting all the relevant parties as they pertain to said vehicle.

76.     Plaintiff contacted the lienholder, Chase Auto Finance, and explained that the vehicle had been reported stolen. Chase explained to Plaintiff that, even though the car was reported stolen, it was still Plaintiff's responsibility to pay for the vehicle. Plaintiff subsequently paid the car note for the month of July, which was due on July 20th, 2021.

77.     Plaintiff then contacted Progressive insurance and paid the insurance. To allow Defendant Mitchell to ride around in Plaintiff's vehicle and on Plaintiff's registration without insurance would be legally unsound. Any uninsured accident with Mitchell at the wheel would undoubtedly open Plaintiff up to liability.

78.     Plaintiff then contacted AUTOPAYPLUS and added his personal
bank account to the AUTOPAYPLUS account. The hold brought on by
Defendant Mitchell fraudulently accessing and removing her payment
information was subsequently removed. See **EXHIBIT (Audio.2) (Hold
removed, account re-instated. Recorded phone conversations between
Plaintiff and U.S. EQUITY'S AUTOPAYPLUS)** Plaintiff had to continue
paying for the "stolen vehicle" until it was recovered according to Chase.

79.     Plaintiff then made several calls to the Southwest Community Police
Office (S.C.P.O.) requesting to speak to Defendant Rains. Defendant Rains
never returned these calls. See **EXHIBIT (Audio.3) (Recorded phone
conversations between Plaintiff and the Southwest Community Police
office)**

80.     Days passed without news of the vehicle's recovery. Plaintiff
couldn't understand how a stolen vehicle could remain stolen for so long
when everything about Defendant Mitchell was known including her
home address, her school address, and her work address.

81.     Plaintiff contacted the Station again. The receptionist explained to
Plaintiff that they hadn't located the vehicle and that they would contact
Him in the event they did so. See **EXHIBIT (Audio.4) (Phone recordings
with S.C.P.O.)**

82.      These phone calls were made on the 5 p.m. to 5 a.m. shift (night shift) as this was Defendant Rains's shift and the shift on which the police report was filed. The explanations given by the night shift as to why the vehicle had not been located coupled with Defendant Rains' failure to return Plaintiff's calls started to look suspicious.

83.      Plaintiff decided to contact S.C.P.O. on the morning shift in hopes of speaking to someone who didn't work on shift with Defendant Rains. Plaintiff requested the name and number of the Detective assigned to the case number. The receptionist would not give the Plaintiff the phone number of the Detective but advised Plaintiff she would have the Detective contact Him at his earliest convenience.

84.      The Detective contacted Plaintiff. It was then that the Plaintiff became aware that the vehicle had never been entered into FCIC/NCIC as a stolen vehicle. The Detective explained, while reading the police report, that Defendant Rains had contacted Defendant Mitchell. Mitchell had submitted bank statements and other receipts to Defendant Rains and based on these receipts, the car was never reported stolen. It was a civil matter.

85.      This is not the first time O.P.D. officers have assured stolen car victims that their vehicle will be entered into FCIC/NCIC as stolen only to

do the complete opposite after the victim leaves the station. See **EXHIBIT (N) (Police report in which victim's car was not entered into FCIC/NCIC as stolen as OPD assured her they would.)**

86.     All this information was new to Plaintiff. Plaintiff asked the Detective how to obtain the police report He was reading from and was directed to O.P.D.'s South Street headquarters.

87.     Plaintiff retrieved the police report that same day. See **EXHIBIT (O)** attached. **(Copy of police report- case #: 2021-00234489)** There were no screenshots nor attachments whatsoever. Plaintiff immediately contacted Defendant Rains via email and explained to him that the evidence submitted by Defendant Mitchell and detailed in his report was not present and requested said evidence from Rains. Rains advised that the evidence sought could only be obtained through public records requests. See **EXHIBIT (P)** attached. **(Copy of email correspondence between Defendant Rains and Plaintiff)**

88.     Plaintiff submitted various public records requests and was given all pertinent documents/evidence to include, (1). Defendant Harrison Rains' time stamped bodycam video footage of the phone conversation between Himself and Defendant Mitchell. See **EXHIBIT (Vid.2) (2) EXHIBIT (Q)** attached. **(Time stamped screenshots of Defendant Mitchell's bank**

**statements.**) (3). Time stamped emails sent to Defendant Rains by Defendant Mitchell containing said bank statements and receipts as attachments. (4). Time stamped quick property receipt submitted by Defendant Rains. (5) Defendant Rains' timestamped email to Defendant Mitchell requesting the purported documentary evidence.)

89.     Upon scrutiny of the police report, Plaintiff noticed that the entire report along with its proffered evidence is a complete farce, rife with falsehoods. Google timestamped geo-location data shows that Plaintiff was at the Southwest Community Police Office from 8:15 p.m. to 9:41 p.m. on July 15th ,2021. See **EXHIBIT (M)** *supra*.

90.     Defendant Rains' timestamped bodycam recorded call with Defendant Mitchell occurred at 10:30 p.m., approximately 49 minutes after Plaintiff left the police station and 33 minutes after Plaintiff entered his home. In addition, Defendant Rain's email request for documents from Defendant Mitchell didn't occur until 10:39pm. See also **EXHIBIT (R)** attached. (**Time-stamped email sent by Defendant Rains requesting documents from Defendant Mitchell.**) Google semantic location data shows Plaintiff was at home at 5124 Conroy Road at 9:57 p.m. and didn't leave until 4:34 a.m. the following morning.

91.     Reading the police report in tandem with the timestamped screenshots and Defendant Rains' timestamped bodycam video footage, it can easily be discerned that Defendant Rains falsified the police report. It's impossible for any of this to have happened.

92.     Defendant Rains could not have explained or notified Plaintiff of any civil court proceedings because when Plaintiff left the Police station at 9:41 p.m., the information upon which Rains bases his reasons for not reporting the vehicle stolen was not yet in his possession. He had not yet spoken to Defendant Mitchell. The transmission of this "evidence" began after the 10:39 p.m. email sent to Defendant Mitchell by Defendant Rains requesting the attachment of documents.

93.     In addition, the "factual" allegations in Defendant Rains' report differ completely from the factual allegations in Plaintiff's handwritten statement.

94.     In the typed report, Defendant Rains is adamant in making Plaintiff's vehicle a loaned vehicle. He has emphasized on multiple occasions that the vehicle at bar was borrowed.

95.     The allegations set forth in Plaintiff's handwritten police report references no such loan. Said handwritten report when viewed in tandem with Defendant Mitchell's bank statements and Defendant Rains' bodycam

videos will show Defendant Rains' allegations of a borrowed vehicle are unsupported by any factual evidence.

96.    Defendant Rains' request of Defendant Mitchell bank statements and receipts not only nullifies the "loaned vehicle" designation, but was also, in and of itself, irrelevant. The sole purpose was to create a semblance of an ownership discrepancy. There was no such discrepancy. Defendant Rains had already verified that the Plaintiff was the sole owner of the vehicle through D.A.V.I.D. He had even asked his night sergeant to ask Clermont Police Department to drive by Defendant Mitchell' home to see if the vehicle was present. Had the vehicle been present, Plaintiff would've been allowed to take the vehicle without any civil proceedings whatsoever.

97.    Defendant Rains' sole purpose for falsifying the police report was to extricate Himself and O.P.D from the situation. These lies were not regular lies. These falsehoods were tactfully created and done so with one purpose. The goal was to leave the situation as is and allow Defendant Mitchell and Plaintiff to find a solution to this problem themselves.

98.    For Defendant Rains to achieve this goal, the "facts" in His police report had to be falsified to match the provisions of **ORLANDO POLICE DEPARTMENT POLICY AND PROCEDURE. §1125.5(1.1) (f),**

REPORTED AND RECOVERED STOLEN VEHICLES. Section 1.1 (f) of

Policy and Procedure 1125.5 states:

> *"The fact that the vehicle has been entered into Teletype or, if*
> *not entered, the reasons why the vehicle/vessel was not, e.g.,*
> *discrepancies in ownership, Teletype down, loaned vehicle."*

99.  Section 1.1(f) *supra* explains some of the reasons why a vehicle

shouldn't be entered into the stolen vehicle database (FCIC/NCIC).

Defendant Rains's falsified report encompasses two of the three reasons

listed. Note the third reason listed is equipment failure. (Teletype down)

100.  The first is a loaned/borrowed vehicle, which Defendant Rains

emphasizes on multiple occasions and is uncorroborated by the facts. The

vehicle was not a borrowed/loaned vehicle.

101.  The second is a discrepancy in ownership, which was falsely

corroborated by Defendant Mitchell's irrelevant bank statements. Again,

Defendant Rains has already verified rightful ownership through

D.A.V.I.D. Plaintiff is the sole owner of the vehicle as a matter of law.

Additionally, Fla. Stat. §812.012(5) defines "Property of another" as

follows:

> "Property of another' means property in which a person
>
> has an interest upon which another person is not privileged to

infringe without consent, whether or not the other person also has an interest in the property.

102.    Once the falsehoods of the police report matched the provisions of §1.1(f) *supra*, Defendant Rains then used said policy and procedure to tie His own hands and prevented Himself from entering the vehicle into FCIC/NCIC as stolen. Hence the civil matter classification.

103.    This "civil matter" classification fails from a factual standpoint. The "facts" used by Defendant Rains to reach the "civil matter" conclusion were all falsified and are uncorroborated by factual evidence. If Defendant Rains had not lied, this conclusion could not have been reached.

104.    This "civil matter" conclusion also fails as a matter of law. Even if, for the sake of conversation, the vehicle was a loaned vehicle, the law is well established in theft cases that how property was acquired is irrelevant. If the Defendant has the requisite intent, he/she is guilty of the crime of theft.

105.    On July 15th, 2021, the date Plaintiff filed the stolen vehicle report, Defendant Mitchell had by then, July 1st, 2021, to be exact, fraudulently accessed Plaintiffs' AUTOPAYPLUS account using Plaintiff's personal information and removed her payment information whilst continuing to possess the vehicle without paying for it. Hence the hold letter sent to

Plaintiff by AUTOPAYPLUS. Defendant Mitchell had by then stopped paying the insurance on the vehicle whilst continuing to operate said vehicle on the public roadways. Hence the insurance cancellation letter sent to Plaintiff by Progressive insurance. The requisite intent by Defendant Mitchell to deprive Plaintiff of his vehicle temporarily or permanently and in so doing, cause financial harm to Plaintiff was abundantly present. The vehicle should have been entered into FCIC/NCIC as stolen.

106.    These lies and permissions of Defendant Rains constituted State action and resulted in violations of: (1). The Takings Clause of the Fifth Amendment of the Constitution. (2). Plaintiff's Due Process rights to protect his property interest secured through the Fourteenth Amendment of the United States Constitution.

107.    Actions taken by Defendant Rains culminated into negligence by Rains and vicarious liability on his employer, Defendant City, as Defendant Rains is directly involved in circumstances which placed Plaintiff within a "zone of risk" by creating or permitting dangers to exist. To wit: Advising Plaintiff that his vehicle would be entered into FCIC/NCIC as stolen but did the complete opposite after Plaintiff left the police station.

108.     These unlawful acts by Defendant Rains, perpetrated under color of

law, resulted in Defendant Mitchell continuing to possess and operate,

even hiding, Plaintiff's vehicle without paying for it and cause Plaintiff

myriad financial damages, including a 'charge off' / repossession of said

vehicle leading to a deficit owed to Chase Auto Finance by Plaintiff after

the vehicle was resold at auction, and massive toll invoices. See **EXHIBIT**

**(S)** attached. (**Document of monies owed to Chase for the vehicle at bar**.)

**EXHIBIT (T)** (**Toll invoice for the month of July, after the police report**

**was filed**).

### III (c) ORLANDO POLICE DEPARTMENT POLICY AND PROCEDURE §1125.5 (1.1) (f), REPORTED AND RECOVERED STOLEN VEHICLES IS FACIALLY UNCONSTITUTIONAL.

109.     The Florida Constitution grants municipalities broad powers to

conduct municipal government, perform municipal functions, and render

municipal services, "except as otherwise provided by law." Art. VIII, §

2(b), Fla. Const. Recognizing the powers granted, along with the

limitations placed on local governments, Florida's Legislature adopted the

Florida Municipal Home Rule Act in 1973, which provides:

>          (1.)     As provided in § 2(b), Art. VIII of the state
>                   constitution, municipalities shall have the
>                   governmental, corporate, and proprietary powers

to enable them to conduct municipal government, perform municipal functions, and render municipal services, and may exercise any power for municipal purposes, except when expressly prohibited by law.

..........

(4.) The provisions of this section shall be so construed as to secure for municipalities the broad exercise of home rule powers granted by the constitutional. It is the further intent of the legislature to extend to municipalities the exercise of powers for municipal governmental, corporate, or proprietary purposed not expressly prohibited by the constitutional, general or special law, or county charter and to remove any limitations, judicially imposed or otherwise, on the exercise of home rule powers other than those so expressly prohibited....

§166.021, **Fla. Stat**. (1973)

110.    The language found in Article VIII, section 2(b) of the Florida Constitution, "except as otherwise provided by law," has been interpreted as limiting municipal power where: (1) the state law expressly preempts the action, or (2) there exists a literal incompatibility or direct conflict between the local ordinance and a state statute. Because the Orlando Police Department's policy and procedure is expressly preempted by Florida law, and is in direct conflict with the Florida statutes, the policy is unconstitutional.

111.    **Orlando Police Department Policy and Procedure** § 1125.5 (1.1) (f)

gives some of the reasons for not entering a vehicle into FCIC/NCIC as

stolen and provides in pertinent part that:

> "The fact that the vehicle has been entered into Teletype
> or, if not entered, the reasons why the vehicle/vessel
> was not, e.g., discrepancies in ownership, Teletype
> down, loaned vehicle."

112.    § 1125.5 (1.1) (b) lists a means of acquisition as a reason for not

entering the vehicle as stolen i.e., loaned vehicle. The inclusion of "loaned

vehicle" in said policy is unconstitutional as it is preempted by **Fla. Stat. §**

812.014 (The Omnibus Theft Act.)

113.    Under the Omnibus Theft Act, how the property of another is

acquired is irrelevant. Section 812.014(1)(a) and 812.014(1) (b) defines theft

as follows:

> (1) A person commits theft if he or she knowingly obtains or
>
> uses, or endeavors to obtain or to use, the property of
>
> another with intent to, either temporarily or permanently:
>
> > (a) Deprive the other person of a right to the property or
> >
> > a benefit from the property.

           (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

114.      **Fla. Sta.** 812.012 (3) (d) (1) defines "Obtains or uses" to mean any manner of:

        (1) Conduct previously known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud, or deception; or

        (2) Other conduct similar in nature.

115.      A loaned or borrowed vehicle becomes a converted or stolen vehicle once the owner demands its return and the converter/thief refuses to grant the owner's wishes. The vehicle thus transitions from loaned/borrowed to converted/stolen.

116.      There is a line of cases echoing that the Omnibus Theft Act has made the means of acquiring property irrelevant as it pertains to theft of said property. These cases go further to explain that it is the criminal intent of the thief when committing any of the offenses listed in §812.012 (3)(d)(1) supra that governs theft.

117.    The Omnibus Theft Act essentially nullified all means of acquisition. However, § 1125.5 (1.1) (f) supra includes a means of acquisition, in the instant case, "Loaned /Borrowed Vehicle", as a reason for not entering vehicles into FCIC/NCIC as stolen. The Omnibus Theft Act offers no such application.

118.    *Orlando Police Department Policy and Procedure* **§1125.5 (1.1) (f)** gives no reference to criminal intent and conflicts with the line of cases surrounding the Omnibus Theft Act. See *United States v Mento*, No. 15-12785 (11th Cir. 2016), *Lewis v. Morgan* 79 So. 3d 926 (Fla. 1st Dist. Ct. App. 2012), *State v. Siegel*, 778 So. 2d 426 (Fla. 5th DCA 2007), *Isenhour v State*, 952 so. 2d 1216 (Fla. 5th DCA 2007). The policy effectively nullifies any criminality surrounding loaned vehicles and allows borrowers to run roughshod over the constitutional rights of owners without any recourse but that of a civil nature. One cannot logically expect a person who 'borrows' a vehicle from an individual to be in any financial position to satisfy any judgment won against them for failure to return said vehicle.

119.    The loaned/borrowed vehicle inclusion in Policy and Procedure 1125.5 (1.1) (f) gets its weight from <u>**Fla. Stat.**</u> **§772.11.  §772.11** states in pertinent part that:

> (1) Any person who proves by clear and convincing evidence that he or she has been injured in any

fashion by reason of any violation of ss. 812.012-812.037 or s. 825.103(1) has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorney's fees and court costs in the trial and appellate courts…….

120.    However, **Fla. Stat. §772.11** has no application in matters involving stolen or unreturned property. The statute only references monetary damages for violations of **ss. 812.012-812.037 or s.825.103(1) after** damages have been incurred. It does not, however, provide a civil remedy for violations of **ss. 812.012-812.037 or s.825.103(1)** occurring prior to monetary damages incurred. Nor does it provide a civil remedy for loaned or unreturned property. It is only after damages have been sustained that **§772.11** becomes relevant and/or applicable.

121.    In the instant case, Plaintiff filed a stolen vehicle report prior to any damages sustained. Thus **§772.11** was dormant as a civil remedy at the time of the said filing and thus inapplicable. The stolen vehicle report was for the return of the vehicle, not for damages, as injury had not yet been incurred. It was only after Defendant Rains falsified the police report and allowed Defendant Mitchell to continue to possess Plaintiff's vehicle that monetary damages were incurred. Thus, bringing a civil suit under **§772.11**

at the time of the filing of the police report would've been frivolous. One could not expect a lawsuit under §772.11 requesting three vehicles back.

122.    **Orlando Police Department Policy and Procedure 1125.5 (1.1) (f)** supra thwarts the legislative intent of the Omnibus Theft Act as it prevents loaned vehicles from being listed as stolen and turns all stolen vehicle reports involving loaned vehicles into civil actions. Simply put, loaned vehicles cannot be stolen vehicles pursuant to this policy. The Omnibus Theft Act preempts any such application. **Orlando Police Department Policy and Procedure 1125.5 (1.1) (f)** is thus facially unconstitutional.

### III (c) AFTER THE POLICE REPORT.

### Olea Laverne Mitchell.

123.    On August 18th, 2021, Plaintiff decided to go to Defendant Mitchell's school in a last-ditch effort to retrieve the vehicle before filing a small claims lawsuit. Defendant Mitchell's whereabouts were easily culled from the toll invoices. Plaintiff would only need to show any tow truck driver the relevant ownership documents and they would tow the vehicle to any location of Plaintiff's liking. Defendant Mitchell's engagement nor permission would be needed.

124.    Plaintiff arrived at the school at around 2:30 p.m. and drove around the school several times to locate the vehicle. The vehicle was not present.

125.    Plaintiff then contacted the Orange County Sheriff's Office and requested their assistance before engaging Defendant Mitchell as Mitchell is armed. See **EXHIBIT (U) (Incident card of O.C.S.O.)**

126.    The Plaintiff observed Mitchell at the front of the school speaking with a fellow student. Defendant Mitchell was not aware of Plaintiff's presence as Plaintiff had not driven his personal vehicle.

127.    Two vehicles from the Sheriff's office showed up, however, they drove around the back of the school as opposed to the front where Defendant Mitchell was standing.

128.    Plaintiff exited the vehicle and proceeded towards Defendant Mitchell and advised her that He was here to get His car with the help of Police. Defendant told Plaintiff that the car wasn't there. That much Plaintiff was aware of. Mitchell was hiding the vehicle. Upon seeing the Sheriff vehicles approaching the front of the building, Defendant Mitchell ran into the school. Plaintiff followed her into the lobby, only to be turned away and threatened with trespassing charges by the receptionist.

129.    Fearing trespassing charges, Plaintiff retreated outside the front entrance where the Sheriffs were now parked and explained that He was

the person who called them and explained the situation and proffered several documents.

130.     Plaintiff spoke mainly to Deputy Ortiz who then returned to his car with the documents. Ortiz could be seen talking on his phone.  Plaintiff conversed with the other unknown Deputy until Ortiz exited the vehicle.

131.     During this conversation with the unknown Deputy, Deputy Ortiz asked Plaintiff to retrieve the stolen vehicle affidavit from His vehicle as it wasn't present in the documents. While on the way to the vehicle, Plaintiff observed Defendant Mitchell running out the side exit of the building and entering a blue compact vehicle which then sped away. The owner of the vehicle was later identified by Defendant Mitchell's as her director of nursing. See **EXHIBIT (V) (Email correspondence between Plaintiff and Defendant Mitchell)**

132.     Plaintiff retrieved the stolen vehicle affidavit and gave it to Deputy Ortiz. Shortly thereafter, He exited the vehicle and returned all the documents to Plaintiff.

133.     Deputy Ortiz then explained that according to the official police report, (Defendant Rains's falsified report) this was a civil matter and there was nothing the Sheriff's department could do about it. Deputies relied solely on Defendant Rains' lies to make their decision.

134.    Deputy Ortiz then gave Plaintiff an Orange County Sheriff's Office incident card with event number 212303071.

135.    Plaintiff subsequently left the school. Before heading home, Plaintiff decided to make one last-ditch effort to locate the vehicle. Plaintiff drove around the surrounding community to see if Defendant Mitchell had hidden the vehicle anywhere within walking distance from the school. Those trips, however, proved futile.

136.    Later that evening, Plaintiff's sister contacted Plaintiff and told him that Defendant Mitchell had contacted her through text messages on Facebook messenger. Plaintiff's sister sent Plaintiff screenshots of the entire conversation. See **EXHIBIT (W)** attached (**Copy of Defendant Mitchell's conversation with Plaintiff's sister via Facebook messenger**)

137.    Defendant Mitchell is adamant that, according to the Police, Defendant Rains, she has done nothing wrong and that the matter can be settled in court like adults.

138.    On August 19th, 2021, Plaintiff filed suit against Defendant Mitchell in small claims court in the County Court of The Ninth Judicial Circuit, in and for Orange County, Florida, case # 2021-SC-047875-O.

139.    The initial hearing date was set for 11/17/2021. Defendant Mitchell was served by the Orange County Sheriff's Office on 8/27/2021.

140.    By this time Defendant Mitchell had amassed another toll invoice of epic proportions. The toll invoice for the month of July after the filing of the police report was a staggering $159.92.

141.    Fed up with law enforcement lies and inaction coupled with Defendant Mitchell's deliberate attacks on Plaintiff's credit and driver's license through the unpaid car note and unpaid tolls, Plaintiff cancelled all accounts relating to said vehicle. Plaintiff canceled the registration on 8/20/2021. See **EXHIBIT (X)** attached. (**Cancellation of registration and surrender of license plate**) Plaintiff could not surrender the license plate due to Defendant Mitchell's hiding of the vehicle.

142.    Plaintiff cancelled the insurance. See **EXHIBIT (Y)** attached. (**Cancellation of insurance effective 7/16/2021 and refund receipt.**)

143.    Plaintiff cancelled the AUTOPAYPLUS account. See **EXHIBIT (Audio.5)** attached. (**Phone recordings of cancellation of AUTOPAYPLUS account.**)

144.    Plaintiff stopped paying the car note for the vehicle altogether as Defendant Mitchell's continued possession of the vehicle after the filing of the police report was based solely on the lies and permissions of Defendant Rains. One could not expect Plaintiff to continue to pay for a

vehicle that Defendant Rains' falsified police report permitted Defendant Mitchell to keep for free.

145.     The vehicle was now legally undrivable which should have urged Defendant Mitchell to return Plaintiff's vehicle as She could no longer legally operate it. Defendant Mitchell continued to keep the vehicle, suffice to say, Defendant Mitchell's depriving Plaintiff of his property had nothing to do with usage of the vehicle. It was based solely on spite and Mitchell's wanting to destroy Plaintiff's credit as She had destroyed her own. A classic case of misery loving company.

146.     On 11/17/2021, the day of the first hearing in the small claims suit against Defendant, the Honorable Judge Juna Pulayya referred both parties to mediation. However, there was no mediation.

147.     On 11/30/2021, Defendant Mitchell contacted Plaintiff via email explaining that She had tried on countless occasions to have Plaintiff remove the vehicle from her home. However, Defendant Mitchell's email is in the very same email thread as that of the original email sent to Mitchell on 07/05/2021 containing the demand letter. See **EXHIBIT (Z) (Copy of emails between Defendant and Plaintiff.)** There are no other emails between Mitchell and Plaintiff in this almost five months period. Another one of Mitchell's many lies.

148.    On December 30th, 2021, while visiting relatives in New Jersey for the holidays, Plaintiff received a phone call from Justin Smart Towing. The tow truck driver advised that he was at Plaintiff's residence to drop off the car at bar. Defendant Mitchell had hired him to tow the vehicle to Plaintiff's residence using her AAA membership card. *(Defendant Mitchell could have done this months ago but chose to be spiteful.)*

149.    Plaintiff explained to the tow truck driver that He was out of town and could not receive the vehicle, and to return the vehicle to Defendant Mitchell. The Plaintiff could not have ascertained the working condition of the vehicle from hundreds of miles away.

150.    According to the tow truck driver, he contacted Defendant Mitchell and explained what Plaintiff told him.  Defendant Mitchell had told him to leave it there until tomorrow, that She would send another truck to pick it up. Tomorrow being December 31st, 2021, New Year's Eve.

151.    Plaintiff then contacted his neighbor, who is a L.E.O. and had her go outside to see what was going on with the tow truck and the vehicle. The tow truck was nowhere in sight. However, the vehicle was left in the road blocking traffic. See **EXHIBIT A.1) (Pictures of vehicle abandoned in the street and blocking traffic-taken by neighbor)**

152.        Plaintiff returned to Florida on January 3rd, 2022. The vehicle was no longer in the road. It had been towed. Its whereabouts unknown.

153.        Chase Auto Finance contacted Plaintiff during this time explaining that the vehicle was now officially a charge off and requested the whereabouts of the vehicle. The Plaintiff explained that he did not know where the vehicle was.

154.        Chase tracked the vehicle to a tow yard and paid the towing fees to retrieve it. Chase then sent Plaintiff the total bill of monies owed.

155.        Plaintiff was awarded a final judgment against Defendant Mitchell in case# 2021-SC-047875-O on August 26th, 2022, in the amount of $ 5734.15. See **EXHIBIT (A.2)** attached (**Copy of Final Judgment for Plaintiff**)

156.        Defendant Mitchell was ordered to complete Florida Small Claims Rules Form 7.343 and return it to Plaintiff within 45 days. More than 45 days elapsed, and Defendant Mitchell had not completed Form 7.343. It seems Defendant Mitchell has no intention of satisfying this judgment.

157.        Plaintiff subsequently filed an ex-parte motion requesting a hearing in aid of execution on October 17th, 2022. See **EXHIBIT (A.3)** attached. (**Ex Parte Motion in aid of execution**)

158.     Plaintiff was granted a hearing on November 15th, 2022, where

Defendant Mitchell claimed she didn't receive the final judgment papers

and therefore had not completed form 7.343. She was subsequently given

another forty-five (45) days to complete the F.A.C.T. Information sheet and

return it to the Plaintiff or face contempt of court proceedings. See

**EXHIBIT (A.4)** attached. **(Order giving Defendant Mitchell another 45**

**days to complete form 7.343 and submit it to Plaintiff or face contempt of**

**court proceedings.)**

159.     On January 4th,2023, Defendant Mitchell sent a letter to Plaintiff

containing 9 sheets of paper purporting to satisfy the provisions of form

7.343. However, the documents are not only falsified, but they are also

incomplete. Mitchell purports to be the head of household in a household

where everybody chips in and pays a portion of the rent, then the total is

sent to the lessor of the property.

160.     Form 7.343 requires the judgment debtor (Mitchell) to furnish the

last three (3) bank statements to the judgment creditor (Plaintiff), Mitchell

has only furnished three pages of bank statements, one page from each

month. Mitchell has not even furnished her social security number as

required by Form 7.343.

161.    The documents furnished by Defendant Mitchell are insufficient to satisfy the requirements of Form 7.343. On January 6th,2023, Plaintiff subsequently began contempt of court proceedings against Defendant Mitchell.

162.    It should also be noted that Defendant Mitchell is no stranger to contempt of court proceedings as She has had prior run-ins with the law for failure to pay. See **EXHIBIT (A.5) (Writ of Attachment issued for Defendant Mitchell, charging document for driving while license revoked as a habitual offender due to failure to pay, bond receipt for contempt of court.)**

### III (d).  U.S. EQUITY ADVANTAGE, INC.

163.    Plaintiff began contacting U.S. EQUITY's AUTOPAYPLUS again in September of 2021. According to AUTOPAYPLUS, all phone calls are recorded. Plaintiff wanted the recordings of Defendant Mitchell's fraudulent conversations with AUTOPAYPLUS.

164.    AUTOPAYPLUS has an account verification process where the personal information of the account owner (Plaintiff) must be verified before access if given to the account. See **EXHIBIT (Audio.6) (Phone recordings of account verification between Plaintiff and AUTOPAYPLUS)**

165.     Plaintiff wanted to hear how Defendant Mitchell verified the

account and subsequently gained access. These recordings would then be

used to file a police report against Defendant Mitchell for criminal use of

personal identification information pursuant to **Fla. Stat.§ 817.568.** Which

would in turn nudge Defendant Mitchell to return Plaintiff's vehicle.

Wishful thinking.

166.     Plaintiff contacted Defendant U.S EQUITY's AUTOPAYPLUS for

four (4) consecutive days requesting said phone recordings between

Themselves and Defendant Mitchell. For three days, Plaintiff was bounced

around by several different U.S. EQUITY employees without getting any

closer to the requested recordings.

167.      On the fourth day, Plaintiff was finally able to speak to an

operations manager named Todd, who refused to give his last name.

Henceforth "No Last Name" Todd. Plaintiff asked "No Last Name" Todd

how Defendant Mitchell was able to pass the account verification process.

How was Defendant Mitchell able to access Plaintiff's account? "No Last

Name" Todd did not say how Defendant Mitchell accessed the account,

however, He explained that, per policy, she would need to verify

Plaintiff's name, address, date of birth, and last four digits of His social

security number to gain access. See **EXHBIT (Audio.7)**

168.    Plaintiff then renewed the request for the phone recordings of Defendant Mitchell fraudulently accessing his account. "No Last Name" Todd explained that Defendant U.S. EQUITY would not release the recordings. Even though Plaintiff was the sole owner of the account, the phone conversations requested were between Defendant U.S. EQUITY and Defendant Mitchell and therefore protected by company policy.

169.    This company policy only allowed Plaintiff access to the conversations between Himself and U.S. EQUITY's AUTOPAYPLUS. However, Plaintiff would first have to complete, sign, and return to U.S. EQUITY, via email, a phone conversation release form prior to the release of any conversations. See **EXHIBIT (A.6) (Signed copy of release form and email with release form attachment sent to Defendant U.S. EQUITY's AUTOPAYPLUS)**

170.    Plaintiff subsequently requested the phone conversation release form which He completed, signed, and returned to U.S. EQUITY's AUTOPAYPLUS via email on said day, 09/30/2021. The relevant phone recordings were sent to Plaintiff via email the following day. See **EXHIBIT (A.7)** attached. **(Email sent to Plaintiff by U.S. EQUITY containing requested phone conversations.)**

171.    On October 14th, 2021, armed with the recorded conversation of U.S. EQUITY's operations manager explaining that Defendant Mitchell needed to verify Plaintiff's personal information to access the account, Plaintiff proceeded to O.P.D. Headquarters to file a police report. Plaintiff was reluctant to file the police report at the Southwest Community Police Office as officers stationed there had already proven their propensity for falsehood. Plaintiff didn't trust them to file another police report because Defendant Rains had so blatantly lied on the first one.

172.    The police report, case # 2021-00344486, was subsequently filed. Plaintiff waited about a week before requesting the name and contact information of the detective assigned to the case.

173.    The detective assigned to the case was one Detective Christopher S. McCreless of O.P.D.'s Economic Crimes Unit. Plaintiff contacted Det. McCreless by phone and explained the situation. Email addresses were exchanged. McCreless requested, by email, that Plaintiff send Him whatever evidence Plaintiff had, especially the recordings. That evidence, if proven to be enough, would allow Det. McCreless to subpoena U.S. EQUITY for the actual recordings. See **EXHIBIT (A.8)** attached. (**Copy of email correspondence with Det. McCreless on October 27th, 2021**)

174.     On Thursday, December 30th, 2021, (The very same day Defendant

Mitchell attempted to return Plaintiff's vehicle), Det. McCreless contacted

Plaintiff via email with an update on the case. McCreless had by then

served a subpoena on U.S. EQUITY and received the subpoenaed

documents and recordings of Defendant Mitchell accessing Plaintiff's

account.

175.     Det. McCreless explained that Defendant Mitchell did not use

Plaintiff's personal information to access the account and thus, did not

violate **Fla. Stat. § 817.568** (Criminal use of Personal information) and

shifted the blame towards U.S. EQUITY's AUTOPAYPLUS' handling of

the accessing of the account. See **EXHIBIT (A.9) (Copy of email case**

**update from Det. McCreless)**.

176.     Plaintiff tried contacting Det. McCreless by phone but was

unsuccessful. Plaintiff requested the recordings subpoenaed by McCreless

by email but did not get a response until Monday, January 3rd, 2022. In His

response, McCreless explained that all the evidence was on disk and was

submitted to OPD Property and Evidence, furnishing Plaintiff with a

public records request link to request whatever recordings were legally

allowed to be released. See **EXHIBIT (A.10)** attached. **(Copy of January 3rd,**

**2022, email between Plaintiff and Det. McCreless.)**

177.    Later that afternoon, Plaintiff submitted a public records request to the records department of Defendant City, requesting the evidence logged by Det. McCreless in case # 2021-344486. See **EXHIBIT (A.11)** attached. **(Public records request Request # 22-39)**. Records Specialist Christopher Gary responded on January 6th, 2022, giving reasons why the documents/recordings couldn't be released.

178.    Plaintiff then contacted the records Department via phone and asked to speak directly with Christopher Gary himself. Plaintiff was put in contact with Gary who explained that Det. McCreless had, through inter-department note, advised the records department not to release the documents to Plaintiff. Gary also explained that only Det. McCreless could effectuate the release of the requested documents and recordings.

179.    Plaintiff was now being barred from the recordings by both Defendants U.S. EQUITY and Det. McCreless. However, all was not lost.

180.    On April 4th, 2022, Case # 2021-SC-047875-O (Andrae M. Johnson vs. Olea Laverne Mitchell) was set to be tried on June 7th, 2022. (See **EXHIBIT (A.12)** attached. **(Notice of Hearing)**

181.    On May 3rd, 2022, Plaintiff filed several notices of intent to serve document subpoenas. Of utmost importance is the notice of intent to serve

document subpoena upon Defendant City's Clerk's office. There were no objections.

182.    The subpoena was issued on May 16th, 2022, and subsequently served on Defendant City on the following day, May 17th, 2022.  Det. McCreless through Defendant City attempted to continue to deny Plaintiff the evidence.

183.    On May 24th, 2022, after paying $196.11, the subpoenaed documents were released to Plaintiff. See **EXHIBIT (A.13)** attached. (**Invoice for subpoenaed documents**) After reviewing the documents and listening to the recordings of Defendant Mitchell's conversations with Defendant U.S. EQUITY, it became obvious why "No Last Name" Todd refused to give Plaintiff the recordings. Defendant Mitchell was given access to the account without verifying Plaintiff's personal information contrary to the policies explained by "No Last Name" Todd.

184.    In the July 1st, 2021, recordings between Defendant U.S. EQUITY and Defendant Mitchell, U.S. EQUITY gave Defendant Mitchell access to Plaintiff's account by only allowing Her to use Plaintiff's address as account verification. (Mitchell didn't verify any other personal information as required pursuant to the U.S. EQUITY'S AUTOPAY PLUS policy explained to Plaintiff by "No Last Name" Todd. Defendant Mitchell can

even be heard telling U.S. EQUITY's employee that the account does not belong to her. Yet She was given access the account and removed her payment information effectuating the hold placed on Plaintiff's account by U.S. EQUITY. This was all done while Defendant Mitchell was hiding Plaintiff's vehicle, refusing to return it, and continued to possess and operate said vehicle without paying for it.

185.     Defendant U.S. EQUITY owed Plaintiff a duty to protect Plaintiff's account from fraud by strictly adhering to its own policies and safeguards as they pertain to account verification and access. These policies and safeguards were not followed, resulting in U.S. EQUITY giving Defendant Mitchell unauthorized access to Plaintiff's account.

186.     Said unauthorized access effectuated by U.S. EQUITY's breach of fiduciary duty enabled Defendant Mitchell to remove her payment information and essentially steal Plaintiff's vehicle, hiding it for six (6) months and causing Plaintiff financial harm to the tune of $5734.15 owed to the lienholder of the vehicle, Chase Auto Finance.

## CLAIM 1:   STATE TORT CLAIM

## DEFENDANT OLEA LAVERNE MITCHELL

## CONVERSION OF PERSONAL PROPERTY
(Pursuant to **Fl. Stat.** § 772.11)

187.      Plaintiff restates and incorporates by reference his previous

allegations above, as if fully set forth herein.

188.      A conversion is an unauthorized act which deprives another of his

property permanently or for an indefinite period. Conversion occurs

where a person wrongfully refuses to relinquish property to which another

has the right of possession.

189.      Plaintiff is the rightful and only owner of the property at bar

pursuant to **Fl. Stat**. § 316.003(54) and 322.01(32).  A 2019 Ford Fusion,

(VIN# 3FA6P0HD5KR183577) See **EXHIBIT (A)** attached. (Buyer's Order,

Agreement & Vehicle Information form). See **EXHIBIT (B)** attached.

(Vehicle registration). Defendant Mitchell is neither a co-signor, nor co-

owner of said property.

190.      Plaintiff requested the return of said property from Defendant

Mitchell on three separate occasions, one by text message, another by

certified mail, and one by email.  Defendant Mitchell refused to return said

property through text messages. See **EXHIBIT (C)** attached.  (**Copy of text**

messages between Plaintiff and Defendant Mitchell) Certified letter was returned unclaimed. See EXHIBIT (D) attached. (Copy of notarized demand letter sent to Defendant Mitchell via certified mail). See EXHIBIT (E) attached. (Copy of USPS tracking of demand letter and actual envelope returned). See EXHIBIT (F) attached. (Copy of email containing demand letter sent to Defendant Mitchell at oleamitchell@yahoo.com) Defendant refused to return Plaintiff's property through text messages and ignored all other correspondences pertaining to the return of Plaintiff's property.

191.    Plaintiff reported the property stolen on 7/15/2021. In dashcam video secured through public records request Defendant Mitchell can be heard in a recorded conversation with Officer Harrison Rains again refusing to return Plaintiff's property. Using the courts as a crutch to deprive Plaintiff of his property.

192.    Plaintiff asserts that he has sufficiently alleged pertinent facts and attached exhibits to show ownership of the subject property and that Defendant Mitchell wrongfully asserted dominion over said property and refused to return it.

193.    Plaintiff was awarded $5734.15, in a final judgment against Defendant Mitchell in small claims court in case number 2021-SC-047875 for the exact

amount owed to Chase Auto Finance. **See EXHIBIT A.2** attached. At the time of this filing Defendant Mitchell had not satisfied this judgment. Plaintiff has commenced garnishment proceedings.

|  |  |
|---|---|
| **CLAIM 2:** | **STATE TORT CLAIM** |
| | **DEFENDANT OLEA LAVERNE MITCHELL** |
| | **CIVIL THEFT OF PERSONAL PROPERTY** |
| | (Pursuant to <u>Fl. Stat.</u> § 772.11(1)) |

194.     Plaintiff restates and incorporates by reference his previous allegations above, as if full set forth herein.

195.     A Claim for civil theft consists of conversion with criminal intent. Defendant Mitchell refused to return Plaintiff's property to wit: **2019 Ford Fusion VIN# 3FA6P0HD5KR183577.** During the time between the request to return the vehicle via text messages and the mailing and emailing of notarized certified demand letters to Defendant and the date the vehicle was reported stolen, (July-15-2021) Defendant accessed Plaintiff's AUTOPAYPLUS account using Plaintiff's address without Plaintiff's permission and removed her payment information while continuing to possess Plaintiff's property without paying for it. See **EXHIBIT (Audio.8)**

(**Recorded conversation between Defendant and AUTOPAYPLUS on July 1st, 2021**)

196.    Though Defendant Mitchell's banking information is on the said account, Mitchell is not a co-owner of the account and has no personal information on file to satisfy account verification prerequisites. For Mitchell to access Plaintiff's account Defendant must verify pertinent personal information belonging to the Plaintiff. See **EXHIBIT (Audio.7)** attached (**Recorded conversation between Plaintiff and Manager of AUTOPAYPLUS**)

197.    Pursuant to **Fl. Stat**. **§ 817.568(1)(f)(1)** "Person identification information" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific person, including: (In pertinent part)

       1.   Name, postal or electronic mail address....

198.    Defendant used Plaintiff's personal identification information to access Plaintiff's AUTOPAYPLUS account and removed her payment information while continuing to possess and refusing to return Plaintiff's vehicle.

199.    During the aforementioned time frame and after the "Stolen Vehicle Report", Defendant amassed a whopping $320.06 in tolls. See **EXHIBIT (I)**

attached (**Tolls invoice: (UTN # R7623787and # R8112032. Emails between Central Florida Expressway Authority and Plaintiff disputing tolls incurred by Defendant Mitchell.**)

200.    Upon scrutiny of the toll invoices, it can be easily discerned that the Defendant is willfully and maliciously amassing as many tolls as possible. Defendant understands that since the vehicle is owned and registered to Plaintiff, all the tolls she amassed would be the sole responsibility of Plaintiff. That Plaintiff would have to either pay the tolls, challenge the tolls with documentation or have His driver's license suspended. Had Plaintiff not been aware of Defendant Mitchell's destructive motives and filed a stolen vehicle report, Plaintiff would've been stuck with these tolls as there was no documentation to show that Mitchell was operating the vehicle when these tolls were incurred.

201.    The police report served as documentation to show that Mitchell was the person operating the vehicle. This information was then forwarded to the Central Florida Expressway Authority and the tolls subsequently waived. Mitchell's behavior constitutes both criminal mischief and harassment by use of personal identification information.

202.    Pursuant to **Fl. Stat.** § 806.13(1) "A person commits the offense of criminal mischief if he or she willfully and maliciously injures or damages

by any means any real or personal property belonging to another.......
**§(b)(2)** states in pertinent part that, "if the damage to such property is
greater than $200 but less than $1000, it is a misdemeanor of the first
degree, punishable as provided in **§ 775.082 or § 775.083.**

203.    Pursuant to **Fla. Stat**. §817.568 (1) (c), "Harass" means to engage in
conduct directed at a specific person that is intended to cause substantial
emotional distress to such person and serves no legitimate purpose.
Mitchell's sole purpose for using Plaintiff's address to fraudulently access
Plaintiff's account was to remove her payment information and run off
with the vehicle without paying for it in hopes of ruining Plaintiff's credit.

204.    Defendant continued to possess and hide Plaintiff's vehicle even
after Plaintiff cancelled the registration and insurance and the vehicle was
no longer legally drivable. These actions were intended to cause Plaintiff
as much financial damage and substantial emotional distress as possible
and served no legitimate purpose.

205.    Plaintiff asserts that he has sufficiently allege pertinent facts along
with attached exhibits to show that the Defendant converted Plaintiff's
property with criminal intent by violating **Fla. Stat.** §817.568(2)(b), **Fla.
Stat.** §817.568(4) and **Fla. Stat**.§ 806.13(1) and constitutes civil theft.

206.     Plaintiff was awarded $5734.15, in a final judgment against Defendant
Mitchell in small claims court in case number 2021-SC-047875 for the exact
amount owed to Chase Auto Finance. **See EXHIBIT A.2** attached. At the
time of this filing Defendant Mitchell had not satisfied this judgment.
Plaintiff has commenced garnishment proceedings.

**CLAIM 3:          STATE TORT CLAIM**
**DEFENDANT U.S. EQUITY ADVANTAGE.**
**BREACH OF FIDUCIARY DUTY.**

207.     Plaintiff restates and incorporates by reference his previous
allegations above, as if fully set forth herein.

208.     The elements of a breach of fiduciary duty are: (1) The existence of a
fiduciary duty; (2) The breach of that duty; and (3) Damage proximately
caused by that breach.

209.     Plaintiff used Defendant U.S. EQUITY ADVANTAGE'S loan
acceleration program AUTOPAYPLUS for the first time in January of 2019.
AUTOPAYPLUS purports to be a loan acceleration program. It is
marketed through prominent car dealerships in Orlando after vehicle
financing is secured. The loan agreement is central to AUTOPAYPLUS's
business model. No loan agreement equals no loan payments acceleration.

The intent of this service is to lower interests accrued on car loans by accelerating the loan payments. The premise being less loan payments equals less interest accrued.

210.    The program required Plaintiff to set up an account giving AUTOPAYPLUS such sensitive information as bank account number, social security number, date of birth, email address and postal address. AUTOPAYPLUS then uses this information to debit the bank account on file and timely pay the lien holder on Plaintiff's behalf. Said sensitive information is also used as verification for gaining access to the account remotely or over the phone.

211.    Defendant U.S. EQUITY ADVANTAGE thus owed Plaintiff a fiduciary duty to not only pay the lien holder on time on Plaintiff's behalf, but also to protect Plaintiff's account from any form of unauthorized access as this account holds sensitive information that in the wrong hands could potentially make Plaintiff a target of fraud.

212.    Defendant Mitchell contacted US EQUITY ADVANTAGE on July 1st seeking to remove her payment information from Plaintiff's account.  US EQUITY ADVANTAGE gave Defendant Mitchell access to Plaintiff's account without abiding by their own account verification procedures, Mitchell only verified Plaintiff's address. This unauthorized access allowed

Mitchell to remove her payment information, put Plaintiff's account on hold, and steal Plaintiff's vehicle. See **EXHIBIT (Audio.8)** *supra*.

213.    US EQUITY ADVANTAGE thus breached its fiduciary duty to Plaintiff by giving Mitchell unauthorized access to Plaintiff's account. Mitchell is not an account holder, nor joint account holder. There exists no fiduciary nor contractual relationship between U.S. EQUITY's AUTOPAYPLUS and Defendant Mitchell. Mitchell should not have been given access to this account by any means as any action taken by Defendant Mitchell in said account only affects the Plaintiff.

214.    This breach led to Defendant Mitchell possessing and hiding Plaintiff's vehicle for months without paying for it, causing the vehicle to be charged off/repossessed by the lienholder Chase Auto Finance. This charge-off/repossession led to Plaintiff owing the lien holder $5734.15. See **EXHIBIT (S)** *supra*.

215.    Plaintiff asserts that he has sufficiently allege pertinent facts along with the attached exhibits to show that Defendant U.S. EQUITY ADVANTAGE breached its fiduciary duty to Plaintiff by giving Defendant Mitchell unauthorized and unverified access to Plaintiff's account.

### CLAIM 4:   STATE TORT CLAIM

### DEFENDANT CITY OF ORLANDO.

### ORLANDO POLICE DEPARTMENT POLICY AND PROCEDURE §1125.5 (1.1) (f), REPORTED AND RECOVERED STOLEN VEHICLES IS PREEMPTED BY THE OMNIBUS THEFT ACT AND IS FACIALLY UNCONSTITUTIONAL.

216.    Plaintiff restates and incorporates by reference his previous allegations above, as if fully set forth herein.

217.    Plaintiff restates and incorporates by reference his previous allegations above, as if fully set forth herein.

218.    Plaintiff filed a stolen vehicle report on July 15th, 2021, however, after multiple calls to the police station at which the report was made, and acquiring the police report, Plaintiff became aware that the vehicle was never reported stolen as Defendant Harrison Rains said it would.

219.    The police report classified the vehicle as a loaned/borrowed vehicle and for those reasons the vehicle was not entered into FCIC/NCIC as stolen. According to Defendant Rains' police report, it was a civil matter.

220.    *Orlando Police Department Policy and Procedure* §1125.5(1.1) (f)., along with Defendant Rains's lies were the reasons for not entering Plaintiff's vehicle as stolen.

221.    However, *Orlando Police Department Policy and Procedure* §1125.5 (1.1)

(f) is facially unconstitutional as it is preempted by the *Omnibus Theft Act*.

§1125.5 (1.1) (f) references a means of acquisition for not entering a vehicle

into FCIC/NCIC as stolen i.e., loaned vehicle. *The Omnibus Theft* Act offers

no such application. The *Omnibus Theft Act* has essentially nullified any

means of acquisition as it pertains to the theft of property.

222.    §1125.5 (1.1) (f) is thus in direct conflict with the *Omnibus Theft Act*

and the long line of cases stemming from said Act and is facially

unconstitutional. See *United States v Mento*, No. 15-12785 (11th Cir. 2016),

*Lewis v. Morgan*, 79 So.3d 926 (Fla.1st Dist. Ct. App. 2012), *State v. Siegel*,

778 So.2d 426 (Fla. 5th DCA 2007), *Isenhour v State*, 952 So. 2d 1216 (Fla. 5th

DCA 2007) In these cases, the courts reiterated that how property is/was

acquired is irrelevant as it pertains to theft of property. These cases go

further to explain that it is the criminal intent of the thief when committing

any of the offenses listed in the Omnibus Theft act that governs theft.

223.    Plaintiff asserts that he has sufficiently allege pertinent facts along

with relevant case law and authorities showing that *Orlando Police

Department Policy and Procedure* §1125.5 (1.1) (f) is preempted by the

*Omnibus Theft Act* and runs afoul of Art. VIII, § 2(b) of the Florida

Constitution.

## CLAIM 5: STATE TORT CLAIM
## DEFENDANT HARRISON RAINS
## NEGLIGENCE

224.     Plaintiff restates and incorporates by reference his previous

allegations above, as if fully set forth herein.

Under Florida law, the four elements of negligence are:

1.  A duty, or obligation, recognized by law, requiring the defendant to
    conform to a certain standard of conduct, for the protection of others
    against unreasonable risks.

2.  A failure on the defendant's part to conform to the standard
    required: a breach of the duty....

3.  A reasonably close causal connection between the conduct and the
    resulting injury. This is what is commonly known as "legal cause,"
    or "proximate cause," and which includes the notion of cause in fact.

4.  Actual loss or damage....

225.     On July 15th, 2021, Plaintiff went to the Southwest Community

Office at approximately 8:15 pm. Plaintiff's intent was to file a stolen

vehicle report against His ex-girlfriend Defendant Olea Mitchell who had

not only refused to return Plaintiff's vehicle after several text messages and

demand letters, but had also illegally accessed Plaintiff's account and removed her payment information with the sole intent of destroying Plaintiff's credit by continuing to possess and hide the vehicle without paying for it. Mitchell had even stopped paying the insurance on the vehicle whilst continuing to operate the vehicle on the public streets.

226.     Plaintiff became aware of these developments when he received letters from Defendant U.S. EQUITY ADVANTAGE's AUTOPAYPLUS and progressive insurance respectively. See **EXHIBIT (H) (Copy of hold letter sent by AUTOPAYPLUS.)** See also **EXHIBIT (G) (Copy of insurance cancellation letter)**

227.     Armed with the letters from the insurance company and Defendant U.S. EQUITY ADVANTAGE respectively and ready to file the report, Plaintiff encountered minor difficulties as the police station office was closed.

228.     Plaintiff then called the number displayed on the front door of the office and explained that He wished to file a stolen vehicle report. Plaintiff was advised that there were no officers present now to file the police report and that one would be with him shortly.

229.     At approximately 8:51 pm, Defendant Rains (34553) approached Plaintiff's vehicle flashing his flashlight. See **EXHIBIT (Vid.1) (Video**

**footage of Defendant Rains' body cam secured through the F.O.I.A.)**
Plaintiff can be seen exiting his vehicle with a green folder and heard explaining the situation to Defendant Rains.

230.    Plaintiff accompanied Defendant Rains inside the Police station to file the stolen vehicle report. At 8:54 pm Defendant Rains turned off his body cam.

231.    Defendant Rains ascertained through the D.A.V.I.D. system that Plaintiff was the rightful and only owner of the vehicle. Plaintiff was then given the opportunity to file the stolen vehicle report.

232.    After writing the statement in the police report and signing the stolen vehicle affidavit, Defendant Rains advised Plaintiff that before the entered the vehicle as stolen, he would have his night sergeant call Clermont Police Department and have them ride by Defendant Mitchell's home to see if the vehicle was present. If it was, Plaintiff would be given the opportunity to retrieve it. However, if the vehicle wasn't present, he would enter the car as stolen. The vehicle was not present.

233.    With the assurance by Defendant Rains that He would enter the vehicle as stolen, Plaintiff's presence at the station was no longer practical. At 9:41 pm, the Plaintiff left the station.

234.    Relying on Defendant Rains' assurance that the car would be entered as stolen, Plaintiff contacted all the relevant parties as they pertain to the vehicle.

235.    Plaintiff first contacted the lienholder, Chase Auto Finance, and explained that the vehicle had been reported stolen. Chase advised Plaintiff that, although the vehicle was reported stolen, it was Plaintiff's responsibility to continue paying for the vehicle. Plaintiff subsequently paid the car note for July, which was due on July 20th.

236.    Plaintiff then contacted U.S. EQUITY's AUTOPAYPLUS and re-instated the account by adding His banking information. This allowed them to debit Plaintiff's account and pay Chase. The hold on the account was subsequently removed.

237.    Plaintiff then contacted the insurance company and paid the insurance. Allowing Mitchell to continue to drive Plaintiff's vehicle without insurance would be legally unsound.

238.    Plaintiff made several calls to the Southwest Community Police office requesting to speak to Defendant Rains and seeking status updates on the whereabouts of the vehicle. Defendant Rains never returned Plaintiff's calls.

239.     The receptionist even advised Plaintiff that they hadn't found the
vehicle and would contact Plaintiff in the event they did so. They even
advised Plaintiff that should he know the whereabouts of the vehicle, He
should not approach Mitchell without first contacting them. See **EXHIBIT
AUDIO.3.**

240.     Plaintiff later ascertained that the car was never entered as stolen,
that Defendant Rains falsified the police report and allowed Defendant
Mitchell to keep Plaintiff's vehicle after Plaintiff had left the police station.

241.     Bolstered by Defendant Rains' negligent actions, Defendant Mitchell
went on to keep Plaintiff's vehicle, even hiding it, until December 30th, of
the same year. Mitchell made no payments, paid no insurance, and
amassed over $350 in tolls.

242.     The vehicle was subsequently repossessed/charged off by the
lienholder Chase Auto Finance and resold at auction leaving Plaintiff with
a bill of $5734.15.

There are generally four recognized bases for imposing a duty of care:

(1) Legislative enactments or administrative regulations.

(2) Judicial interpretations of such enactments and regulations.

(3) Other judicial precedent; and

(4) a duty arising from the general facts of the case.

243.     Here, Plaintiff asserts the common-law duty (the undertaker's

doctrine) arising from the general facts of this case. See *Restatement*

*(Second) of Torts* §§ 323-324A (1965).

244.     A special tort duty arises when law enforcement officers become

directly involved in circumstances which place people within a "zone of

risk" by creating or permitting dangers to exist, by taking persons into

police custody, detaining them, or otherwise subjecting them to danger.

See *Pollock v. Florida Dept. of Highway Patrol* 882 So.2d 928 (Fla. 2004)

245.     Florida courts have also determined that a special duty is

established when a police officer makes a direct representation to a

plaintiff, or one so closely involved with the plaintiff that their interests

cannot be separated, that he or she will take a specified law enforcement

action. See *Brown v. City of Delray Beach*, 652 So.2d 1150. (Fla. 4th DCA 1995)

246.     The Florida Supreme Court has long adhered to the common-law

doctrine that:

> "[i]n every situation where a man undertakes to act, or to
>
> pursue particular course, he is under an implied legal obligation or
>
> duty to act with reasonable care, to the end that the person or
>
> property of others may not be injured by any force which he sets in
>
> operation, or by any agent for which he is responsible. If he fails to

64

> exercise the degree of caution which the law requires in a particular
> situation, he is held liable for any damage that results to another,
> just as if he had bound himself by an obligatory promise to exercise
> the required degree of care...[E]ven "where a man interferes
> gratuitously, he is bound to act in a reasonable and prudent manner
> according to the circumstances and opportunities of the case"

*Banfield v Addington*, 104 Fla. 661, 140 So.2o. 893,896 (1932).

247.    In the case at bar Defendant Rains owed Plaintiff a special duty as he
informed Plaintiff that he would take a specified law enforcement action
i.e., enter Plaintiff's vehicle in FCIC/NCIC as stolen if it wasn't present at
Defendant Mitchell's address.

248.    Defendant Rains breached that duty of care to Plaintiff by not
entering the vehicle as stolen in FCIC/NCIC as he had assured Plaintiff he
would.

249.    Rains contacted Defendant Mitchell after Plaintiff left the station and
had Mitchell email irrelevant bank statements and miscellaneous
screenshots which were then used as "evidence" to create reasons for not
entering the vehicle as stolen. It was now a "civil matter." See **EXHIBIT
video.1 (Defendant Rains' time-stamped body-cam footage of phone
conversation between himself and defendant Mitchell.), EXHIBIT Q**

**(Time-stamped screenshots of defendant Mitchell's bank statements), EXHIBIT R** (Time-stamped email sent by defendant Rains requesting documents from defendant Mitchell.) and **EXHIBIT O (Copy of police report: case # 2021-00234489).**

250.     **Exhibit video.1, Exhibit Q** and **Exhibit R** all show timestamps after 9:41 pm, the time Plaintiff left the station. See **EXHIBIT M (Google semantic location data of Plaintiff's cellphone.)** Plaintiff was unaware of any of this taking place until he secured the police report. Defendant Rains had not only breached the duty of care owed to the Plaintiff, but in doing so, placed Plaintiff in an increased zone of risk that was non-existent at the time of the filing of the police report. Rains had even falsified the police report to cover said breach.

251.     Three sections of the Restatement (Second) of Torts §§ 323 outline the parameters of the undertaker's doctrine. Section 323 provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform is undertaking, if;

(a)    his failure to exercise such care *increased the risk of such harm*, or

(b) the *harm is suffered* because of *the other's reliance upon the undertaking*.

252.    Section 323 "applies whether the harm to the other or this things results from the Defendant's negligent conduct in the manner of his performance of the undertaking, or from his failure to exercise reasonable care to complete it or to protect the other when he discontinues it"; however, "the actor may normally abandon his efforts at any time *unless, by giving the aid*, he puts the other in a worse position than he was in before the actor attempted to aid him."

253.    Consequently, where the actor's assistance has put the other in a worse position than he was before, either because the actual danger of harm to the other *has been increased by the partial performance, or because the other, in reliance upon the undertaking, has been induced to forgo other opportunities of obtaining assistance*, the actor is *not free to discontinue his services where a reasonable man would not do so*. He will then be required to exercise reasonable care to terminate his services in such a manner that there is no unreasonable risk of harm to the other, or to continue them until they can be terminated.

254.     Defendant Rains' breach of this duty increased the harm to Plaintiff exponentially as it allowed Defendant Mitchell to continue to possess and operate Plaintiff's vehicle for almost six (6) without paying the car note or the insurance meanwhile amassing massive toll violations on Plaintiff's registration and leading to the repossession/charge off of Plaintiff's vehicle.

255.     The repossession of Plaintiff's vehicle due to the negligence of Defendant Rains has subjected Plaintiff to monetary damages of $5734.15 owed to Chase Auto Finance after the vehicle was repossessed/charged off and resold at auction. See **EXHIBIT S (Document of monies owed to Chase for the vehicle at bar.)**

256.     Plaintiff was awarded a judgment against Defendant Mitchell in small claims court in case # 2021-SC-047875-O in the exact amount listed above. See **EXHIBIT A.2 (Copy of final judgement for Plaintiff.)** Mitchell has yet to satisfy this judgement.

257.     Plaintiff asserts that he has sufficiently alleged pertinent facts, with corresponding exhibits, and relevant case law and authorities to show that Defendant Rains was negligent in his undertaking of the stolen vehicle report.

258.     That Defendant Rains negligence is the cause of Plaintiff damages. That Plaintiff would not have reinstated any accounts pertaining to the vehicle at bar had Defendant Rains not told him that the care would be reported stolen.

259.     That Plaintiff would not have suffered these damages had Defendant Rains exercised his duty of care owed to Plaintiff by reporting Plaintiff's vehicle stolen as he assured Plaintiff he would.

260.     Plaintiff was awarded $5734.15, in a final judgment against Defendant Mitchell in small claims court in case number 2021-SC-047875 for the exact amount owed to Chase Auto Finance. **See EXHIBIT A.2** attached. At the time of this filing Defendant Mitchell had not satisfied this judgment. Plaintiff has commenced garnishment proceedings.


**CLAIM 6:     STATE TORT CLAIM**
**DEFENDANT CITY OF ORLANDO**
**VICARIOUS LIABILITY THROUGH THE**
**NEGLIGENCE OF DEFENDANT HARRISON**
**RAINS.**


261.     Plaintiff restates and incorporates by reference his previous allegations above, as if fully set forth herein.

262.    Defendant Harrison Rains at all relevant times is/was a police officer employed by the Orlando Police Department through the Defendant City of Orlando.

263.    "The conduct of an employee is within the scope of his employment, for the purpose of determining the employer's vicarious liability to third persons injured by the employee, only if:

(1) the conduct is of the kind the employee is hired to perform,

(2)  the conduct occurs substantially within the time and space limits authorized or required by the work to be performed, and

(3)  the conduct is activated at least in part by a purpose to serve the master." See *Sussman v. Florida East Coast Properties, Inc.*, 557 So.2d 74,75-76 (Fla. 3rd DCA 1990), See also, *Carter v. America Online Inc.*, 208 F.Supp.2d 1271,1278-79 (M.D. Fla.2001)

264.    Defendant Rains, as a police officer for the Orlando Police Department, employed through Defendant City of Orlando, is hired to perform law enforcement duties including the filing of police reports.

265.    The filing of the police report in the case at bar occurred while Defendant Rains was on duty for Defendant City, and on Defendant City's property at Southwest Community Police Office located at 6440 Raleigh St., Orlando Florida. 32811.

266.    Defendant Rains' conduct was activated by his purpose as a law
enforcement officer to serve his employer Defendant City and follow the
Policy and Procedures of the Orlando Police Department.

267.    Defendant City of Orlando is vicariously responsible for the
negligent acts and omissions of its agents, servants, representatives,
employees and/contractors.

268.    On July 15th, 2021, Defendant City of Orlando's employee Defendant
Harrison Rains had a duty to perform his duty as an Officer of the Orlando
Police Department on behalf of City of Orlando with reasonable care.

269.    On July 15th. 2021, Defendant City of Orlando's employee Harrison
Rains breached his duty of care and was negligent in the following ways:

      a.  Advised Plaintiff that he would report Plaintiff'
vehicle stolen, but did the complete opposite after
Plaintiff left the police station,

      b.  Plaintiff relied on Harrison Rains' assurance that the
vehicle would be reported stolen and reinstated
accounts associated with said vehicle based on said
assurances.

      c.  Intentional misconduct, as Defendant Rains had
actual knowledge of the wrongfulness of his conduct

(As can be gleaned from the falsified police report) and the high probability that injury or damage to the Plaintiff would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage to Plaintiff.

    d.  Gross negligence as Defendant Rains's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Plaintiff's rights.

    e.  That Defendant City of Orlando's employee and Orlando Police Department Supervisor/Sergeant Anna Melnick along with other unnamed employees condoned, ratified, or consented to Harrison Rains' negligent conduct by signing off on a Rains' falsified police report and by conveying to the Plaintiff that they were actively looking for Plaintiff's vehicle when the vehicle was never entered as stolen.

270.    At all times material hereto, Defendant's employees knew or, in the exercise of reasonable care, should have known of the dangerous outcome of not reporting Plaintiff's vehicle stolen and allowing Defendant Mitchell

to continue to possess and operate Plaintiff's vehicle without Plaintiff's knowledge.

271.    Defendant Mitchell had by then fraudulently accessed Plaintiff's account and removed her payment information with the intent to continue possessing Plaintiff's vehicle without paying for it. Mitchell has stopped paying the insurance while continuing to operate the vehicle on the public roadways. This information was given to Defendant City of Orlando's employee Harrison Rains at the filing of the police report.

272.    As a direct and proximate result of the negligence of Defendant City of Orlando employee, Harrison Rains, The City of Orlando is vicariously liable. Defendant Rains' negligent acts on behalf of Defendant City of Orlando allowed Defendant Mitchell to keep Plaintiff's vehicle for almost six months without paying for it, amassing over $350 in tolls on Plaintiff's registration without paying them. Plaintiff's vehicle was subsequently repossessed/charged off by the lienholder and resold at auction. Plaintiff now owes Chase Auto Finance $5734.15 for this repossession/charge off. Chase has sent multiple letters to Plaintiff demanding the payment of said monies.

273.    Plaintiff asserts that he has sufficiently alleged pertinent facts to show that Defendant City of Orlando is vicariously liable for the negligent

acts of its employee Harrison Rains and for the condoning and ratification

of said negligent conduct by his supervisor/Sergeant Anna Melnick and

other City of Orlando employees.

## CLAIM 7: FEDERAL COURT CLAIM Pursuant to 42 U.S.C. § 1983. DEFENDANT HARRISON RAINS (OFFICIAL CAPACITY) VIOLATION OF THE FIFTH AMENDMENT'S TAKINGS CLAUSE, AS APPLIED TO THE STATES THROUGH THE FOURTEENTH AMENDMENT.

274.    Plaintiff restates and incorporates by reference his previous

allegations above, as if fully set forth herein.

275.    The Fifth Amendment's Takings Clause, as applied to the states

through the Fourteenth Amendment, provides that "private property

[shall not] be taken for public use, without just compensation.

276.    The Takings Clause is typically implicated in two scenarios. First, it

applies to situations where the government physically takes or occupies

private property.

277.    Next, it applies when the government regulates private property to

such an extent that it "deprives the owner of the economic use of the

property.

278.    Here Plaintiff avers the actions of Harrison Rains, in his official

capacity, constituted the latter; government regulation of private property

that deprives the owner of the economic use of said property.

279.    Defendant Harrison Rains, after assuring Plaintiff that His vehicle

would be reported stolen, waited until Plaintiff left the station and

contacted Defendant Mitchell. Rains then requested irrelevant bank

statements and receipts from Defendant Mitchell. These irrelevant bank

statements and receipts were then used in tandem with Defendant Rains'

lies to falsify the police report in order to render Plaintiff's vehicle a

"loaned vehicle".

280.    Once the "loaned vehicle" classification was reached, Defendant

Rains then used the facially unconstitutional Orlando Police Department

Police and Procedure 1125.5 (1.1) (f) to refrain from entering Plaintiff's

vehicle into FCIC/NCIC as stolen.

281.    All of this was done in the absence of Plaintiff and the police report

falsified by Defendant Rains to "show" that Plaintiff was present during

this entire ordeal and apprised of the appropriate court processes. The

plaintiff was not.

282.    Cell Site Location Information (C.S.L.I.) and Google Semantic

location history will show that Plaintiff left the police station at 9:41 pm, 49

minutes before Defendant Rains' 10:30 pm bodycam recorded phone conversation with Defendant Mitchell.

283.    Defendant Rains' time-stamped email to Defendant Mitchell requesting document "evidence" didn't occur until 10:39 pm, 58 minutes after Plaintiff left the station.

284.    Defendant Mitchell's time-stamped screenshot of documentary "evidence" didn't occur until 11:33pm. Said "evidence" was then sent to Defendant Rains via time-stamped email at 11:43 pm.

285.    The transfer of this "evidence" began 49 minutes after Plaintiff left the station and ended approximately two (2) hours after Plaintiff left the station, yet Defendant Rains' police report claims, "both parties were explained the court process and how to move forward". Defendant Rains could not have explained any court process to Plaintiff because:

        (1). The Plaintiff was not present.

        (2). The documentary "evidence" on which Defendant Rains bases his reason for not reporting Plaintiff's car stolen was not yet in his possession when Plaintiff left the station. Rains had not yet contacted Defendant Mitchell.

286.     Plaintiff had no knowledge of these acts of Defendant Rains until He retrieved the stolen vehicle report from the Orlando Police Department's South Street Headquarters.

287.     It is well established law that once a vehicle becomes the subject of a species of conversion or theft, the owner has vitiated any prior permission for the use of misuse of the vehicle. *See Hertz Corp. v. Jackson*, 617 So. 2d 1051, 1053 (Fla.1993).

288.     On July 15th, 2021, when Plaintiff filed the stolen vehicle report, the vehicle at bar became the subject of a species of conversion or theft. Thus Plaintiff, in filing said stolen vehicle report, rescinded any prior permission given to Defendant Mitchell to operate said motor vehicle on the public roadways.

289.     The minute Defendant Rains contacted Defendant Mitchell and falsified the police report to allow Defendant Mitchell to continue to possess and operate Plaintiff's vehicle, after the vehicle became the subject of a species of conversion or theft, and any prior permission rescinded, a Taking under the Fifth Amendment's Takings Clause occurred.

290.    Mitchell was now possessing and operating Plaintiff's vehicle solely

on the permission of Defendant Rains, permission Defendant Rains does

not have the authority to give.

291.    This violation of Plaintiff's Fifth Amendment Rights (Takings

Clause) by Defendant Rains allowed Defendant Mitchell to continue to

possess, operate and deprive Plaintiff of his vehicle for almost six (6)

months without compensation while deliberately amassing over $350 in

tolls on Plaintiff's registration. Tolls Plaintiff had to challenge or pay to

stop his driver's license from being suspended.

292.    Plaintiff's vehicle was subsequently repossessed/charged off by the

lienholder Chase Auto Finance and resold at auction. Plaintiff now owes

Chase Auto Finance $5734.15. Chase Auto Finance has sent multiple letters

requesting the payment of said debt.

293.    Plaintiff asserts that he has sufficiently alleged pertinent facts to

show that Defendant Harrison Rains, in his official capacity, violated

Plaintiff's Fifth Amendment Rights (Takings Clause) by falsifying the facts

in the stolen vehicle report to match the provisions of the facially

unconstitutional Orlando Police Department Policy and Procedure 1125.5

(1.1) (f) and in doing so, deprived Plaintiff of the use of his property by

allowing Defendant Mitchell to continue to possess and operate Plaintiff's vehicle without compensation.

### CLAIM 8: FEDERAL COURT CLAIM Pursuant to 42 U.S.C. § 1983.

**DEFENDANT HARRISON RAINS (INDIVIDUAL CAPACITY)**

**DEPRAVATATION OF PROPERTY WITHOUT DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES. SUBSTANTIVE DUE PROCESS.**

294.    Plaintiff restates and incorporates by reference his previous allegations above, as if fully set forth herein.

295.    The Due Process Clause of the Fourteenth Amendment provides that "no state shall… deprive any person of life, liberty, or property without due process of law."

296.    The Due Process clause encompasses two forms of due process rights, the substantive, and the procedural. Here Plaintiff asserts that his substantive due process rights were violated by the actions of Defendant Harrison Rains.

297.    The established legal standard of a substantive due process claim is defined as actions that "shock the conscience" or conduct intended to

injure a person arbitrarily, or government conduct disconnected from a legitimate government interest. Historically, this guarantee of substantive due process applies to deliberate decisions of government officials to deprive a person of life, liberty, or property.

298.    On June 28th, 2021, Plaintiff contacted the Orlando Police Department information desk and requested information on how to best rectify the present situation. The Officer explained that since Plaintiff was the person who gave Defendant Mitchell permission to possess and operate the vehicle, it was a civil matter. Plaintiff must first send Mitchell a notarized letter via certified mail demanding the return of the vehicle. If Mitchell did not respond to the demand letters in ten (10) days, Plaintiff could report the vehicle stolen.

299.    Plaintiff sent Defendant Mitchell notarized demand letters by both certified mail and email. The certified mail returned unclaimed, and Mitchell did not respond to the emailed demand letter.

300.    On July 13th, 2021, prior to the filing of the stolen vehicle report, Plaintiff received letters from Progressive insurance and AUTOPAYPLUS respectively. The letter from Progressive insurance pertained to insurance cancellation. Defendant Mitchell had stopped paying the insurance on the

vehicle while continuing to operate it. The letter from AUTOPAYPLUS pertained to a hold placed on Plaintiff's account. Defendant Mitchell had fraudulently accessed Plaintiff's account and removed her payment information. Mitchell had been on a tear removing all payments associated with the vehicle while refusing to return the vehicle to Plaintiff.

301.    On July 15th, 2021, when Plaintiff filed the stolen vehicle report, all the aforementioned letters from AUTOPAYPLUS and Progressive insurance in tandem with a copy of the certified demand letter were proffered to Defendant Rains as evidence.

302.    Defendant Rains then ascertained that Plaintiff was the rightful owner of the vehicle using the D.A.V.I.D. system. Rains even asked Plaintiff to identify Defendant Mitchell by showing Plaintiff a picture of Mitchell's driver's license on the computer.

303.    Plaintiff proceeded to write the statement of the stolen vehicle and signed the stolen vehicle affidavit. Defendant Rains assured Plaintiff that he would have his night sergeant Anna Melnick call Clermont Police Department and have them drive-by Mitchell's home to see if the vehicle was present. If the vehicle was present, Plaintiff would be allowed to

retrieve it. If it wasn't, Defendant Rains assured Plaintiff that he would enter the vehicle as stolen. The vehicle wasn't present.

304.     Plaintiff left the police station on the assurance that Defendant Rains would enter the vehicle into FDIC/NCIC as stolen.

305.     As explained earlier, the car was never entered as stolen. Defendant Rains contacted Defendant Mitchell after Plaintiff left the station and allowed Mitchell to keep Plaintiff's vehicle.

306.     Mitchell was not a co-owner nor co-buyer of this vehicle; Plaintiff was the sole owner of the vehicle as Defendant Rains had earlier gleaned from the D.A.V.I.D. system. Mitchell has no property interest in said vehicle as the Florida Legislature has vested her with none.

307.     Defendant Rains deliberately falsified the police report to match the provisions of the unconstitutional Orlando Police Department Policy and Procedure §1125.5(1.1) (f) and illegally appropriated Plaintiff's vehicle to Defendant Mitchell without even advising Plaintiff of the new developments nor of any court proceedings to initiate. Defendant Rains had not even returned any of Plaintiff's calls made to the Southwest Community Police Office about the status of the vehicle.

308.      During this time Mitchell was driving Plaintiff's vehicle without

paying for it, nor paying the insurance, amassing massive tolls on

Plaintiff's registration while Plaintiff sat waiting on a phone call from

O.P.D. advising him that the vehicle was found. A call that never came as

the vehicle was never entered into F.C.I.C./N.C.I.C. as stolen.

309.      Defendant Rains' conduct was deliberate and intended to injure

Plaintiff arbitrarily as it aided Defendant Mitchell in stealing Plaintiff's

vehicle and served no legitimate government interest and violates

Plaintiff's substantive due process rights.

310.      Defendant Rains' conduct is even more shocking to the conscience

when viewed in tandem with Defendant Mitchell's driving record.

Mitchell has five (5) driving while license suspended stemming from

unpaid tolls, driving while license revoked as a habitual offender, writ of

attachment for failure to appear, or failure to comply with provide current

address. All this information was available to Defendant Rains as it is

visible on the D.A.V.I.D. system, yet Defendant Rains exhibited conduct

that was financially indifferent to Plaintiff as the outcome to his actions

could have easily been foreseen.

311.    Plaintiff asserts that He has sufficiently alleged pertinent facts with attached exhibits to show that Defendant Harrison Rains violated Plaintiff's substantive due process rights when he deliberately engaged in conduct that violated Plaintiff's Fifth Amendment Rights under the Takings Clause by intentionally falsifying the facts of the stolen vehicle report to match the provisions of Orlando Police Department Policy and Procedure §1125.5 (1.1) (f) in his quest to aid Defendant Mitchell in stealing Plaintiff's vehicle.

312.    Defendant Mitchell with the aid of Defendant Rains went on to possess and operate, even hiding Plaintiff's vehicle for almost six months without paying for it, while amassing over $350.00 in tolls. Tolls Plaintiff had to either pay or challenge to stop his driver's license from being suspended. Plaintiff's vehicle was subsequently repossessed/charged off by the lienholder Chase Auto Financing and resold at auction leaving Plaintiff with a debt owed in the amount of $5734.15.

313.    Plaintiff was awarded $5734.15, in a final judgment against Defendant Mitchell in small claims court in case number 2021-SC-047875 for the exact amount owed to Chase Auto Finance. **See EXHIBIT A.2** attached. At the time of this filing Defendant Mitchell had not satisfied this judgment. Plaintiff has commenced garnishment proceedings.

CLAIM 9:          CIVIL CONSPIRACY

Pursuant to 42 U.S.C. § 1983 and Florida Law.

DEFENDANTS HARRISON RAINS AND OLEA
MITCHELL.

314.     Plaintiff restates and incorporates by reference his previous

allegations above, as if fully set forth herein.

315.     A civil conspiracy under Florida law requires: (a) an agreement

between two or more parties, (b) to do an unlawful act or to do a lawful act

by unlawful means, (c) the doing of some overt act in pursuance of the

conspiracy, and (d) damage to the plaintiff as a result of the acts done

under the conspiracy.

316.     A civil conspiracy under 42 U.S.C.§ 1983 requires (1) a violation of

federal rights under color of state law; (2) an "understanding" among the

defendants to violate those rights; and (3) a resultant "actionable wrong."

317.     Plaintiff asserts that on July 15th, 2021, when Plaintiff filed the stolen

vehicle report, Defendant Rains contacted Defendant Mitchell after

Plaintiff left the station and conspired with Her to convert Plaintiff's

vehicle.

318.     Defendant Mitchell is not a co-owner nor co-signor of the vehicle at bar. Plaintiff is the only owner pursuant to **Fl. Stat**. § 316.003(54) and 322.01(32). Ownership that Defendant Rains had verified through the D.A.V.I.D. system.

319.     The Florida Statutes affords Defendant Mitchell no property rights to Plaintiff's vehicle, nor does the Florida or U.S. Constitution, thus any misappropriations of Plaintiff's vehicle to Defendant Mitchell with or without the help of Defendant Rains is theft by conversion.

320.     Defendant Rains conspired with Defendant Mitchell to convert Plaintiff's vehicle by requesting irrelevant receipts and bank statements, none of which are of any legal standing as it pertains to rightful ownership of property.

321.     Defendant Rains then used said irrelevant receipts and bank statements as 'evidence' to falsify the police report and create the semblance of and subsequent classification of Plaintiff's vehicle as a 'loaned vehicle.'

322.     The falsified facts leading to the 'loaned vehicle' classification was now ripe for the 'application' of the facially unconstitutional **Orlando Police Department Policy and Procedure §1125.5 (1.1) (f).** Section **1125.5**

**(1.1) (f) of O.P.D. P&P** list examples for not entering a vehicle in F.C.I.C./N.C.I.C. as stolen. **§1125.5 (1.1) (f). Reported and Recovered Stolen Vehicles** states:

> "The fact that the vehicle has been entered into Teletype or, if not entered, the reason why the vehicle/vessel was not, e.g., discrepancies in ownership, Teletype down, loaned vehicle."

323.    Defendant Rains subsequently applied the facially unconstitutional policy to the falsified police report and used said policy as the reason for not entering Plaintiff's vehicle into Teletype as stolen.

324.    Defendant Rains claimed that "due to the circumstances of the agreement, both parties were explained the court process and how to move forward." Plaintiff was not even present during the dialogue and exchange of 'evidence' between Defendant Rains and Defendant Mitchell. It was only after several unreturned status phone calls to The Southwest Community Police Office that Plaintiff became aware that the vehicle was never entered into Teletype as stolen, and that Defendant Mitchell was still driving Plaintiff's vehicle without any threat of arrest.

325.    Plaintiff asserts that He has sufficiently alleged pertinent facts with attached exhibits to show a civil conspiracy under both Florida and Federal

law by showing that Defendant Harrison Rains, a state actor, reached an understanding with Defendant Mitchell to violate Plaintiff's substantive due process rights when he deliberately falsified the facts of the stolen vehicle report to match the provisions of Orlando Police Department Policy and Procedure §1125.5 (1.1) (f) and aided Defendant Mitchell in stealing Plaintiff's vehicle.

326.     The violation of Plaintiff's substantive due process rights subsequently led to the violation of Plaintiff's Fifth Amendment rights under the Takings clause as this civil conspiracy between the Defendants allowed Defendant Mitchell to continue to possess and operate Plaintiff's vehicle depriving Plaintiff of the use of the vehicle without just compensation.

327.     Defendant Mitchell with the aid of Defendant Rains went on to possess and operate, even hiding Plaintiff's vehicle for almost six months without paying for it, while amassing over $350.00 in tolls. Tolls Plaintiff had to either pay or challenge to stop his driver's license from being suspended. Plaintiff's vehicle was subsequently repossessed/charged off by the lienholder Chase Auto Financing and resold at auction leaving Plaintiff with a debt owed in the amount of $5734.15.

328.    Plaintiff was awarded $5734.15, in a final judgment against Defendant Mitchell in small claims court in case number 2021-SC-047875 for the exact amount owed to Chase Auto Finance. **See EXHIBIT A.2** attached. At the time of this filing Defendant Mitchell had not satisfied this judgment. Plaintiff has commenced garnishment proceedings.

### CLAIM 10: Monell Claim (pursuant to 42 U.S.C.§ 1983.) DEFENDANTS CITY OF ORLANDO & HARRISON RAINS.

329.    Plaintiff restates and incorporates by reference his previous allegations above, as if fully set forth herein.

330.    Municipal bodies are liable for constitutional violations under 42 U.S.C. § 1983 when execution of its official policy or custom deprives an individual of his rights protected under the Constitution. *Monell*, 436 U.S. at 694-95.

331.    A custom or policy can be established by showing: (1) an express policy exists; (2) the final policymakers for the municipality "have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure"; or (3) someone with final policymaking authority

adopted or ratified the unconstitutional act or decision of a subordinate. *See Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016)

332.    Plaintiff's claim is predicated on the first of the three, an express policy.

333.    Orlando Police Department Policy and Procedure 1125.5, Reported and Recovered Stolen Vehicles is an official policy of the Orlando Police Department. The provisions of which are applied to all reported and recovered stolen vehicles as the facts so warrant.

334.    This policy was made effective on September 24th, 2015, under former Orlando Police Department Chief John Mina who was appointed by current and long-standing Orlando Mayor John "Buddy" Dyer.

335.    Under the policy is section 1, **REPORT PROCEDURES**. Under Report Procedures is section 1.1. **INITIAL INCIDENT REPORT**. Of utmost importance is Section 1.1 (f).  § 1.1 (f) states that:

> "The fact that the vehicle has been entered into Teletype or, if not entered, the reasons why the vehicle/vessel was not, e.g., discrepancies in ownership, Teletype down, loaned vehicle.

336.     Plaintiff asserts that this Orlando Police Department Policy and Procedure is the driving force behind Defendant Harrison Rains' violations of Plaintiff's Fourteenth Amendment Due Process rights and Fifth Amendment rights under the Takings Clause.

337.     On July 15th, 2021, the date Plaintiff filed the stolen vehicle report, Defendant Rains contacted and conspired with Defendant Mitchell, after Plaintiff left the station, to deprive Plaintiff of his property without due process of law and effectuated a Taking under the Fifth Amendment.

338.     To achieve this goal, Defendant Rains falsified the facts of the police report to match the provisions of §1.1 (f). The facts were falsified to not only render Plaintiff's vehicle a loaned vehicle, but Defendant Rains also requested irrelevant bank statements and receipts from Defendant Mitchell to create the semblance of a discrepancy in ownership. It must also be noted that ownership discrepancy and loaned vehicle are the only examples listed in §1.1(f) other than Teletype down.

339.     Once the facts of the police report matched the provisions of §1.1 (f), they became ripe for the application of §1.1 (f). Defendant Rains then applied §1.1 (f) to the misappropriated facts to refrain from entering

Plaintiff's vehicle into Teletype and allowed Defendant Mitchell to continue to possess and operate Plaintiff's vehicle without Plaintiff's knowledge.

340.    Defendant Mitchell went on to possess, operate and even hide Plaintiff's vehicle for almost six months without paying for it, even after Plaintiff cancelled the insurance and registration. She amassed over $350 in tolls on Plaintiff's registration. Tolls that Plaintiff had to pay or challenge to stop his driver's license from being suspended.

341.    On December 30th, 2021, four months after Plaintiff cancelled the insurance and registration on the vehicle and five months after the filing of the initial police report, Defendant Mitchell had Plaintiff's vehicle towed to his home. Plaintiff was out of the state for the Christmas holidays. The vehicle was left abandoned in the road blocking traffic and subsequently towed. Its whereabouts unknown.

342.    Chase Auto Finance, the lienholder tracked the vehicle down and repossessed it. The vehicle was subsequently charged off and resold at auction with the Plaintiff owing Chase a debt of $5734.15. Chase has sent Plaintiff multiple letters demanding the payment of said debt.

343.    Plaintiff was awarded $5734.15, in a final judgment against Defendant Mitchell in small claims court in case number 2021-SC-047875 for the exact

amount owed to Chase Auto Finance. At the time of this filing Defendant Mitchell had not satisfied this judgment. Plaintiff has commenced garnishment proceedings.

344.     Plaintiff asserts that He has sufficiently alleged pertinent facts along with attached exhibits to show that:

(1).... Defendant Rains falsified the police report to match the provisions of Orlando Police Department Policy and Procedure 1125.5 (1.1) (f).

(2) ....   Defendant Rains used said policy to prevent himself from entering Plaintiff's vehicle into Teletype as stolen.

(3) ..... Defendant Rains' application of said policy allowed Defendant Mitchell to continue to possess and operate Plaintiff's vehicle without compensation and unbeknownst to Plaintiff's.

(4) .... said application of Policy and Procedure 1125.5 (1.1) (f) was the driving force behind Defendant Rains' violations of Plaintiff right to Due Process rights under the Fourteenth Amendment.

(5).... Said application of Policy and Procedure 1125.5 (1.1) (f) was the driving force behind Defendant Rains' violations of Plaintiff's Fifth Amendment Rights under the Takings Clause.

## DECLARATORY RELIEF

345.    Plaintiff seeks declaratory judgment that Defendant City of Orlando's Orlando Police Department Policy and Procedure 1125.5 (1.1) (f) is facially unconstitutional because it violates Art. VIII § 2(b) of the Florida Constitution for being in direct conflict with the Omnibus Theft Act.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against the Defendants, and grant the following:

A. Enter a declaratory judgment on behalf of Plaintiff that Defendant City of Orlando's Orlando Police Department Policy and Procedure 1125.5 (1.1) (f) inclusion of the term "loaned vehicle" is preempted by the Omnibus Theft Act and is facially unconstitutional under Art. VIII § 2 (b) of the Florida Constitution.

B.  Enter judgment on behalf of Plaintiff against Defendant Mitchell for three (3) times the actual damages of $5734.15 or $17,202.45 for the civil theft of Plaintiff's property pursuant to **Fla. Stat.** 772.11 (1).

C.  Enter judgment on behalf of Plaintiff against Defendant Mitchell for three (3) times the actual damages of $5734.15 or $17,202.45 for the civil theft of Plaintiff's property pursuant to **Fla. Stat.** 772.11 (1).

D.  Find that Defendant Mitchell has committed multiple felonies against Plaintiff and appropriate proper punishment.

E.  Enter judgment on behalf of Plaintiff against Defendant Rains in the amount of $51,607.35 or three (3) times the statutory amount requested against Defendant Mitchell pursuant to **Fla. Stat.** 772.11 (1).

F.  Enter judgment on behalf of Plaintiff against Defendant U.S. EQUITY ADVANTAGE INC. in the amount of $51,607.35 or three (3) times the statutory amount requested against Defendant Mitchell pursuant to **Fla. Stat.** 772.11 (1).

G.  Enter judgment on behalf of Plaintiff against Defendant City of Orlando for vicarious liability through the negligence of

Defendant Rains and other unnamed agents in the amount of $51,607.35 or three (3) times the statutory amount requested against Defendant Mitchell pursuant to <u>Fla. Stat.</u> 772.11 (1).

H. Enter judgment on behalf of Plaintiff against Defendant City of Orlando for punitive damages for the vicarious liability through the negligence of Defendant Rains and other unnamed agents in the amount of $154,822.05 or three (3) times the amount requested against Defendant Harrison Rains.

I. Enter judgment on behalf of Plaintiff against Defendants for reasonable actual damages sufficient to compensate him for the violations of his Due Process rights and Fifth Amendment rights under the Takings Clause of the United States Constitution.

J. Order Defendants to pay punitive damages and other exemplary damages based on 42 U.S.C. § 1983 claims.

K. Order Defendants to pay Plaintiff's attorney's fees and costs as authorized by 42 U.S.C. §1988; pre-judgment interest and any other relief deemed necessary and proper.

L. For leave to amend Complaint to include a claim for punitive damages under state law; and

M. Grant all other and additional relief to which Plaintiff may be

entitled.

Dated: May 3rd, 2023,

By: _____

Andrae Mar Johnson (Pro se)

5124 Conroy Road, Unit # 611

Orlando, Florida 32811

Phone: (407) 807-2947

Email: progressive859@gmail.com

97